## THE STATE v. LAWRENCE.

1. **Jury**: HOW DRAWN. Jurors for the Circuit and District Courts may be drawn from the same list. A separate list is not required for the Circuit Court.

2. **Criminal Law**: QUALIFICATION OF JURORS: BIAS. A juror who said: "I believed the man had been murdered, and defendant did it. It would take some evidence or explanation to remove the opinion from my mind. I have no bias upon my mind for or against the defendant. I know nothing about the case except what I have heard from rumor and newspaper prints. * . * * I believe I can sit and decide the case with the same impartiality as if I had never heard of the case:" *Held* to be competent.

3. ———: JURY: ADMONITION OF THE COURT. When upon being recalled into Court a jury was admonished by the Judge "that if any juror went into that jury-box with the pre-determination as to how he should find his verdict and to hang the jury or to cause a disagreement, if the verdict could not be rendered as he wanted it, he would have 'a happy time of it,' to speak facetiously," but that he did not wish "to interfere with

The State v. Lawrence.

. the opinion or action of any juror who acts conscientiously and in accordance with his best judgment:" *Held*, not to be such an undue interference with the prerogatives of the jury, as to vitiate their verdict.

4. ———: INSTRUCTION: DEGREES OF CRIME. Where one was convicted of manslaughter, a failure in the instructions to fully distinguish between that crime and murder in the second degree was error without prejudice.

*Appeal from Des Moines District Court.*

WEDNESDAY, DECEMBER 17.

THE defendant was indicted for murder in the second degree, and upon trial was found guilty of manslaughter.   He appeals. The necessary facts are stated in the opinion.

*Newman & Blake* and *Halls & Baldwin*, for appellant.

*Frank Springer* with *Henry O'Connor*, Attorney-General, for the State.

DAY, J.—I.   The cause was called for trial at the April Term, 1871, when the defendant interposed a challenge to the panel, as follows:   "Said jury was not selected and drawn as prescribed by law. Said jury was selected from a list of names, and not by drawing, as prescribed in chapter 115 of the Code of Iowa and amendments, by the officers whose duty it was to select the same."

1. JURY: how drawn.

Thereupon the Auditor of the county was introduced, who testified that "according to the statute the list of petit jurors was selected in the fall of 1870, from a list of 250, furnished from the different townships according to statute, that from said list 250 were made out as required from which to select the petit jurors for the succeeding year, that but one such list was made out, and from which the petit jurors for the District and Circuit Courts of the county, were drawn for the January term, 1871, of the District Court, and the February term, 1871, of the Circuit Court, and from which list the jury for the present term was drawn, and from no other list."

The defendant thereupon moved a *venire de novo*.  The objection to the panel and said motion were overruled, and

defendant excepted. Appellant insists that separate lists should be made out, from which to select jurors for the District and Circuit Courts. The provisions of the statute upon the subject are as follows:

"Two jury lists, one consisting of seventy-five persons to serve as grand jurors, and one consisting of one hundred and fifty persons, to serve as petit jurors, and both lists composed of persons competent and liable to serve as jurors, shall be annually made in each county, from which to select jurors for the years commencing on the first day of January, annually. Should there be less than that number of such persons in any county, the list shall comprise all those who answer the above description; and, in counties containing a population of over twenty thousand inhabitants, the list of petit jurors shall consist of two hundred and fifty persons." Revision § 2723, and § 2724 as amended by § 3, Chap. 167, Laws 1870. These sections do not provide a jury list for any particular court. The prescribed list shall be annually made from which to select jurors for the year, commencing on the first day of January. A jury list is provided for each county from which to select a jury for the ensuing year. If a new court is created with authority to use a jury, and no provision is made for securing a list from which to select such jury, the subsequent legislation will be construed in connection with the existing provisions, and will be regarded as imposing an additional burden upon those selected to fill the required lists. The act creating the Circuit Court provides as follows: "The Circuit Court of each county shall be a court of record, and all statutes now in force respecting the venue and commencement of actions, the jurisdiction, process, and practice of the District Court, the pleading and mode of trial in actions at law or in equity, the relation and attendance of petit jurors * * * * shall be deemed applicable to said Circuit Court, except when the same may be inconsistent with the provisions of this act." Thus a jury is provided for the Circuit Court, and the provisions of the law respecting them are made applicable thereto.

The law no where expressly demands a separate jury list for

the Circuit Court, and in our opinion, a proper construction of the statutes in force does not require it.

II. Two Jurors, J. H. Worthington and Elijah Beans, were challenged by defendant for cause, and the challenge was dis-
2. ——: qual- allowed. The facts touching their competency,
ification of
jurors : bias.   though not identically, are substantially the same,
and we will therefore consider the facts elicited with regard to one only.   The District Attorney propounded to Beans, in substance, all the subdivisions of § 4771 of the Revision, and he answered all of them in the negative.   In answer to further questions propounded to him Beans stated: "I have heard of the transaction of the killing of Anton Bauerback, at the time it happened, and read the newspaper account of it, the channels of information through which it reached me.   I believed the man had been murdered, and that the defendant did it.   It would now take some evidence or explanation to, remove the opinion from my mind.   I have no bias upon my mind for or against the defendant.   I know nothing about the case except what I have heard from rumor and newspaper prints.   I have no personal knowledge of the facts otherwise; and I believe that I can sit and decide the case with the same impartiality, as if I had never heard of the case." It is scarcely possible in a community, where an act has been done which, startles and attracts the public mind, to obtain a juror, who should be entrusted with so grave a matter as the determination of the question of the guilt or innocence of the accused, whose mind has received no impression with regard to the case.   Either from public rumor, or newspaper reports, almost every person competent to serve as a juror, will have learned something in regard to the circumstances attending the commission of the alleged offense.   And, as some impression, more or less strong is almost invariably made by such reports, the rule which would demand a juror with no opinion respecting the case, would in cases attracting public attention, and in which intelligence is most needed, practically exclude every intelligent man from the jury.   With respect to this question Roosevelt, J., in *Sanchez v. The People*, 4 Parker's Criminal Reports, 553, uses the following appropriate language:

"The Court below admitted the juror to be qualified, and it is quite obvious that if jurors are on such grounds to be rejected, it will be impossible at the present day to administer justice in cases sufficiently exciting to inspire a newspaper paragraph. Every male adult, over twenty-one and under sixty, in possession of his natural faculties, and not infirm or decrepit, of sound judgment and well informed, (and no other can be a juror) must read the news of the day, and must, from such reading, form some idea or impression. If an idea or impression, therefore, is to be a disqualification, no competent juror, at the present time, can be found; for no man in a land of newspapers, can 'be well informed' without reading; or with a 'sound judgment' can read without receiving an idea or impression."

An opinion once formed, is rarely removed without "some evidence or explanation." And yet an intelligent, right minded man, notwithstanding such opinion, can determine a case, upon the evidence submitted, without bias, partiality, or prejudice. It is much safer to submit the grave concerns of life to such a juror, than to one who does not take sufficient interest in current events, to know what is transpiring around him. The law does not require that a juror shall be without opinion respecting a case. "A challenge for implied bias may be taken for any of the following causes:    *    *    *

    *    *    *    Having formed or expressed an unqualified opinion or belief, that the prisoner is guilty or not guilty of the offense charged." Revision, § 4771, sub-division 8. The juror stated that he had not formed such opinion. His further examination does not show that he had formed such opinion. He was therefore a competent juror. Any rule rendering him incompetent would be found utterly impracticable. See *Wau-kon-chaw-neek-kaw v. United States*, Morris Rep., 332; *State v. Hinkle*, 6 Iowa, 380; *State v. Sater*, 8 Iowa, 420; *State v. Thompson*, 9 Iowa, 188; *State v. Ostrander*, 18 Iowa, 451; *The People v. Stout*, 4 Parker's Criminal Reports, 108; *Sanchez v. The People*, Id. 553.

III. The evidence disclosed the following state of facts: The defendant for some time entertained ill will toward the

deceased in consequence of certain alleged slanderous statements of deceased respecting defendant.

About six o'clock on the evening of the affray defendant met Anton Bauerback, the deceased, coming up an alley in Burlington, and asked him to stop, which he did not do. Defendant then took hold of deceased's arm. Deceased told him to let go, or he would pick him up and break him in two. Defendant then said, "You Dutch son-of-a-bitch, you have got to take back what you have said." Afterward defendant stated two or three times that he intended to whip Bauerback.

About 9 o'clock the same evening deceased was standing on the steps of the Lawrence House. Defendant came out of the door and slapped him on the shoulder with his open hand. Deceased turned round and defendant struck him with his left fist, and he fell down on the pavement. Defendant jumped from the door on deceased as he lay on the sidewalk, and commenced kicking him, and jumped upon him once or twice. Defendant's father came out, and defendant said, "There is your man; I have done it. Let them arrest me." Deceased did not rise nor offer any resistance after he struck the pavement. He died in about thirty minutes. An examination of his person discovered a wound over the right eye, about an inch long; another across the nose running diagonally across the face; two cuts on the back of the head similar to the one in front, and an appearance of fracture of the small bones of the base of the skull. There was extravasation of the brain. The opinion of the physicians was that death resulted from mechanical injuries upon the head. The jury having been out about thirty-six hours, were brought into the court room, and proceedings were had which are set out in the bill of exceptions as follows:

"Be it remembered that on the trial of this cause, after the same had been submitted to the jury, and the jury had been out for about thirty-six hours, the officer in charge of them was directed to bring the jury into court. That after the names of the jurors had been called, the foreman of the jury informed the court that they had not been able to agree. The court then inquired of them whether they differed as to the

The State v. Lawrence.

degrees of guilt, or whether the defendant was guilty or not; and one of the jurors responded, they differed as to all three. The court then inquired of them whether they were pretty equally divided, and one of the jurors responded that the jury stood "ten to two, or nine, two, and one." The court then remarked that there ought to be no difference of opinion among the jurors in the case. At this one of the jurors remarked, " that they did not know what the opinion of one or two of the jurors was, but that they knew how they voted."

" Whereupon the court stated to the jury, 'that if any juror went into that jury box with the pre-determination as to how he should find his verdict, and to hang the jury, or to cause a disagreement if the verdict could not be rendered as he wanted it, he would have a 'happy time of it,' to speak facetiously; that it had been reported to the court that two of the jurors went into the jury box for the purpose of controlling the verdict, or securing a disagreement; and that if so, they were infinitely worse than the defendant himself. That he hoped the report was not true; that he did not wish by these remarks, to interfere with the opinion or action of any juror who acts conscientiously, and in accordance with his best judgment.'

3. ——: admonition by the court.

" The court was induced to make these remarks to the jury because it was advised there was a willful disregard of the evidence in the cause, and of the instructions, by one or two of the jurors, and because of the report referred to in the remarks of the court to the jury. To which action of the court the defendant then and there objected and excepted as being an undue and improper procedure, and an interference with the prerogatives of the jury. The verdict of the jury was returned in about two hours after said remarks were made to them. Said proceedings on the part of the court were oral, and not delivered in writing, but reduced to writing, and handed to counsel of defendant immediately after making them."

We recognize in its fullest extent the doctrine that a jury, in an honest and conscientious endeavor to determine the facts of a case, should be free from the dictation and interference of the court. And whenever it is rendered reasonably apparent

that the province of the jury has been so far invaded as to prevent a free and honest investigation of the case, we would not hesitate to interfere. We do not, however, see how the defendant can have been prejudiced by the action of the court complained of. We cannot see how any honest and fair minded juror, conscientiously seeking after truth, and holding with an even hand the scales between the State and the accused, could have returned any other verdict than that which was rendered. The court told the jury that he did not wish to interfere with the opinion or action of any juror who acts conscientiously, and in accordance with his best judgment. No juror, therefore, conscious of just purposes and right intentions, could attribute the remarks of the court to himself, or modify his action in consequence thereof.

The *propriety* of some of the remarks it would be somewhat difficult to vindicate, but that they do not constitute error justifying a reversal of the case we feel quite clear.

The remarks, though delivered orally, were immediately reduced to writing, and handed to counsel of defendant. No pretense is made but that they were correctly written. There is, therefore, no prejudice to defendant from this action.

IV. The defendant introduced one Carnahan, as a witness, and to show provocation for the act, proposed to prove that within an hour of the principal occurrence deceased and defendant met, and had a conversation, in which the prisoner requested the deceased to state if he had used certain slanderous words against the chastity of defendant's wife, repeating them to him, and the deceased refused to recant them, but intimated that they were true, and threatened the defendant if he did not keep away from him he would break him in two. The court excluded this evidence, and the defendant assigns the action as error. If the evidence had been admitted, it could have furnished no justification for an assault upon the deceased, much less for taking his life. The most that could have been claimed for the evidence would have been a reduction of the offense to the lowest grade of homicide. The jury so reduced the crime by their verdict. Hence in this ruling there is nothing of which defendant can complain.

V. The defendant requested of the court twenty-one instructions, covering six pages of the printed abstract, all of which the court refused. Most of them contain correct statements of the law, but present mere abstract propositions, more likely to confuse and mislead, than to aid the mind unused to drawing nice legal distinctions. The court gave thirty instructions, covering ten pages of the abstract. The charge of the court in our opinion, embraces a very full, accurate and fair exposition of the law applicable to the case, presenting every phase of the defense. The jury could not have failed to receive from it a correct understanding of the necessary legal propositions. A specific objection to the instructions is that they do not correctly or clearly reflect the distinction between murder in the second degree and manslaughter. The instructions do, however, fully set forth the distinction recognized in the books, and as the defendant was convicted of manslaughter a failure to more sharply define the difference between the two crimes, worked him no substantial prejudice.

The jury, having been out for some time deliberating upon their verdict, came into court and reported that they had failed to agree, and one juror said they had trouble over a certain one of the court's instructions. Thereupon the court in writing explained the instruction alluded to, and proceeded as follows: "You must look at the whole evidence of the case in determining as to who struck the first blow, or as to who was the aggress r, and if there is no testimony that the deceased was the aggressor, struck the first blow; and if there is affirmative evidence that defendant did strike the first blow, and if the defendant made threats that he would whip or chastise the deceased before the homicide, and if he stated afterward that he had whipped him, then you should conclude that the defendant was the aggressor, and not the deceased." When this is analyzed it amounts to no more than a direction that if there is no evidence of a given fact, and is evidence of the contrary fact, a jury should find the fact to exist of which there is evidence, rather than that of which there is no evidence. Surely this furnishes no just ground of complaint.

A careful examination of the whole record, satisfies us that

there is no substantial error, and that a different result from that reached could not reasonably be hoped. The judgment is

AFFIRMED.