OLIVER BURTON v. HIRAM NEILL, Appellant.

**Deliberations of jury:** INSTRUCTION TO FURTHER CONSIDER THE CASE. Where a jury upon only a brief deliberation reports a disagreement the court is justified in insisting upon a further consideration of the case, and may with proper instruction as to the desirability of arriving at a conclusion direct them to return to their room for that purpose; and the fact that a verdict was returned several hours thereafter does not of itself indicate that the instruction was productive of anything more than a further deliberation.

**Same:** PRESENCE OF COUNSEL. A direction to the jury to return to their room for further deliberation, under instructions as to the desirability of arriving at a verdict if possible, may be given by the court in the absence of counsel; as the statute requiring the presence of counsel when additional instructions are given has reference to the giving of instructions relating to the evidence which the jury is to consider and the law applicable thereto.

**Production of evidence:** WAIVER OF ERROR. A party cannot complain that a witness was not permitted to describe and give the technical names of muscles involved in reducing a dislocated bone, where the witness was afterwards permitted to describe the muscles, and at the time of the ruling counsel stated that he did not desire the technical names.

**Physicians:** MALPRACTICE: SUFFICIENCY OF EVIDENCE. The evidence in an action for malpractice is reviewed at length, and it is held that the court was not justified in holding as a matter of law that a dislocation of plaintiff's shoulder as contended by plaintiff was an impossibility, or that the impossibility of reducing the same was conclusively established, but that it was sufficient to support a finding that defendant was negligent in failing to discover the dislocation and reduce the same.

*Appeal from Osceola District Court.*—HON. JOHN F. OLIVER, Judge.

TUESDAY, NOVEMBER 17, 1908.

ACTION to recover damages for malpractice of the defendant, a physician, in failing to properly reduce a dislocation of plaintiff's shoulder. There was a verdict for the plaintiff for damages in the sum of $245, and from a judgment on this verdict the defendant appeals. *Affirmed.*

*C. M. Brooks,* for appellant.

*O. J. Clark,* for appellee.

McCLAIN, J.—1. This case was submitted to a jury about nine o'clock on the morning of January 18, 1906, and the jury then retired for deliberation. At two o'clock in the afternoon of the same day the jury returned into court, with the report that they were unable to agree upon a verdict, and had agreed to disagree, and thereupon, at the direction of the court, they were reconducted to their room, with instructions to proceed with their deliberations. Fifteen minutes afterward, however, the jurors were called into court, and, replying, in response to a question of the court, that there seemed to be no prospect of their agreeing upon a verdict, the court gave the jury an additional instruction, to the effect that it was the duty of each to lay aside all pride of judgment, and carefully review the ground of his opinion, and endeavor to reach an agreement, and, further, that the case had been exhaustively tried, and a disagreement would necessitate a new trial, entailing a large expense upon the parties; and the jurors were directed to return to their room and examine their differences in a spirit of fairness and candor, and endeavor, if possible, to agree upon a verdict. Thereupon the jurors again retired, and at nine o'clock in the evening of that day brought in a verdict for the plaintiff.

From affidavits of jurors, introduced in support of defendant's motion for a new trial, it appears that, when

they reported a disagreement, three of them had stood un-
swervingly against a finding for the plaintiff
in any sum whatever, and were in favor of
a verdict for defendant, and that after the
giving of the additional instruction, and as
a consequence thereof, these three jurors agreed to a ver-
dict in plaintiff's favor. So far as this showing made by
affidavits of jurors is concerned, we think it wholly imma-
terial. The fact that the jurors had not been able to agree
was made known to the court in the regular manner, and
a subsequent agreement, on a verdict reached nearly seven
hours after the additional instruction was given, does not
indicate that any other result than that of a further
deliberation by the jurors was produced by the giving of
the instruction. The court was justified in insisting that
the jurors should give further deliberation to the case for
the purpose of reaching an agreement, if possible, and the
instruction was in accordance with the proper practice in
such cases, and not erroneous in the language used. *State
v. Richardson,* 137 Iowa, 591; *Delmonica Hotel Co. v.
Smith,* 112 Iowa, 659; *Frandsen v. Chicago, R. I. & P.
R. Co.,* 36 Iowa, 372.

1. DELIBERATIONS OF JURY: instruction to further consider the case.

II. It appears that the additional instruction was
given in the absence of defendant and his counsel, and with-
out any effort, on the part of the court, to advise them that
the jurors were to be further instructed, and
it is contended that in this respect the court
erred. In support of this contention the cases
of *Davis v. Fish,* 1 G. Greene (Iowa), 406, and *O'Con-
nor v. Guthrie,* 11 Iowa, 80, are relied upon. These cases
are by no means conclusive. The thought seems to be that
such instructions should be given only in open court; that
is, not in the jury room, nor at a time when the court can-
not properly transact judicial business. In other States
there has been some conflict in the decisions on the ques-
tion, but the great weight of authority is to the effect that

2. SAME: presence of counsel.

while the jury is deliberating the court is in session so far as the case is concerned, and it is the duty of counsel to be present, in order to take notice of whatever is done in the case; and that, while as a matter of courtesy, a judge may, if he sees fit, have counsel called if not present, he is under no legal obligation to do so, when he has occasion to give further instructions to the jurors. *Chapman v. Chicago & N. W. R. Co.,* 26 Wis. 295, 305 (7 Am. Rep. 81); *Cooper v. Morris,* 48 N. J. Law, 607 (7 Atl. 427); *Hudson v. Minneapolis, L. & M. R. Co.,* 44 Minn. 52 (46 N. W. 314); *Reilly v. Bader,* 46 Minn. 212 (48 N. W. 909); *State v. Pike,* 65 Me. 111; *Nat. Life & Trust Co. v. Omans,* 137 Mich. 365 (100 N. W. 595); *Fournier v. Pike* (C. C.), 128 Fed. 991.

The case of *Sargent v. Roberts,* 1 Pick. (Mass.) 337 (11 Am. Dec. 185), relied on in our early cases on the subject, has been practically overruled in *Kullberg v. O'Donnell,* 158 Mass. 405 (33 N. E. 528, 35 Am. St. Rep. 507). Many authorities on the subject are collected in 1 Blashfield on Instructions, sections 182, 183. But for this State the subject is now regulated by a provision of the Code, as follows:

Sec. 3720. Additional instructions. After the jury has retired for deliberation, if they desire to be instructed as to any point of law arising in the case, they may request the officer to conduct them into court, which he shall do, when the court may further instruct, which instruction shall be given in the presence of or after notice to the parties or their counsel. Such instruction shall be in writing, be filed as other instructions in the case, and be a part of the record, and may be excepted to in the same manner and time as the instructions given before the jury retires.

While this section specifically refers only to cases where the jury has requested additional instructions, it should no doubt be applied also to cases where the court calls in the jury, on his own motion, to give them further instructions,

for such an occasion is clearly within the spirit and purpose of the statutory rule. It is to be noticed, however, that the section has relation only to instructions "as to any point of law arising in the case," and it is necessary to consider whether the direction given by the judge in this instance to the jury was such an instruction as is contemplated. The requirement that counsel be advised is no more obligatory than that the instruction be in writing, and it is quite uniformly held that the instructions which must be in writing under statutory requirements are only expressions of the principles of the law applicable to the case, or some branch or phase of the case, which the jury are bound to apply in order to render a verdict establishing the rights of the parties in accordance with the facts proven. *Lehman v. Hawks,* 121 Ind. 541 (23 N. E. 670); *Moore v. City of Platteville,* 78 Wis. 650 (47 N. W. 1055); *State v. Jones,* 7 Nev. 408; *Boggs v. United States,* 10 Okl. 424 (63 Pac. 969, 65 Pac. 927). These cases are selected from many which bear on the subject, because they involve just such an instruction to the jurors, with reference to their duty, as was given in this case. That general directions to the jurors as to their duty, not having any bearing upon the evidence which they are to consider and the law applicable thereto, are not instructions such as are required to be in writing under statutory provisions is illustrated by many cases. See *Johnson v. Rider,* 84 Iowa, 50; *Judge v. Jordan,* 81 Iowa, 519; *State v. McLafferty,* 47 Kan. 140 (27 Pac. 843); *State v. Potter,* 15 Kan. 302; *McCallister v. Mount,* 73 Ind. 559; *Stanley v. Sutherland,* 54 Ind. 339, 354. Many other cases are cited in 1 Blashfield on Instructions, sections 119-122. The court committed no error, therefore, in giving the direction to the jury without notice to counsel which would enable them to be present.

III. In the cross-examination of a witness, who testified as a physician with reference to the reduction by him

of the dislocation · of plaintiff's shoulder, ten weeks after

3. PRODUCTION
OF EVIDENCE:
waiver of
error.

the happening of the accident, there was some question as to the resisting force which he had to overcome in putting back the bone into its socket, and he was asked what muscles were there, and how many, and to describe them. The court refused to allow the witness to be called upon to state the technical names of the muscles, nerves, tendons, and tissues of the shoulder. At the conclusion of a colloquy between the court and the cross-examining counsel it was stated by counsel that he was not asking for technical names, but for a description of the resisting power of the various muscles, and the court ruled that the witness might describe the muscles, but need not give the technical names of them. Counsel excepted to this ruling, and now assign it as error, but we think without any substantial ground; for counsel immediately afterward asked the witness to describe the muscle that in his opinion acted as a resisting power to his performing the operation described, and the witness proceeded to do so without objection. The only portion of the court's ruling that · restricted counsel in his cross-examination was the statement that the witness need not give the technical names of the muscles, and counsel was protesting throughout that he did not desire the technical names, but only a general description.

IV.   The chief contention for the appellant is, however, that the verdict of the jury was contrary to law and the instructions of the court, and was not sustained by

4. PHYSICIANS:
malpractice:
sufficiency of
evidence.

sufficient evidence, and that it was the result of passion and prejudice. The testimony of plaintiff and witnesses who saw him at the time of or soon after the accident could leave no doubt in the minds of the jury that plaintiff was suffering from a severe injury of some kind to his shoulder. His own account of the happening of the accident was that a halter strap. with which he was holding a cow in his stable,

became so wrapped about his hand or wrist that he could not release his hold upon her, and that, being frightened, she jerked him through the door of the stable, and he struck against the sill, and was rendered unconscious, the cow escaping by the breaking of the strap. Witnesses who assisted him into the house and called defendant as a physician, and were present at his examination of the shoulder from time to time testify that the shoulder and arm were badly bruised, and there can be no doubt that the violence suffered was such as might produce a dislocation, and did disable plaintiff's arm and shoulder. After ten weeks' treatment by the defendant plaintiff became dissatisfied with the results, and called upon one Heetland, a practicing physician of ten years' standing, and a member of the same medical society with the defendant, for the purpose of having his shoulder examined with an X-ray machine. Dr. Heetland did not use his machine, which was at the time not in order for use, but made a physical examination of the shoulder, and discovered, as he testified, that the head of the humerus was below the glenoid cavity in which it should naturally be, and rested against the lower edge of the scapula. In other words, he discovered, as he claims, a subglenoid dislocation. This he proceeded to reduce, with the assistance of three other persons called in for the purpose, who were not physicians. The patient was placed on his back on a couch, and after an anæsthetic had been administered, two of the assistants drew the arm out at right angles to the body and Dr. Heetland, removing his shoe, placed his heel in the patient's armpit, and caused the arm to be drawn down parallel with the body, which forced the head of the humerus into its proper socket, where it was retained by bandages. A subsequent examination of the shoulder, by physicians appointed by the court, demonstrated the fact that if there had been a dislocation, it was reduced, and the shoulder was in substantially normal condition, although the muscles of the arm were some-

what wasted, and the plaintiff was still suffering from some pain unless, as one of the examining doctors intimated, the pain was feigned. In short, the evidence for plaintiff tended strongly to show that plaintiff had received a severe injury; that defendant had treated him for it without satisfactory results; that Dr. Heetland, ten weeks after the injury was received, discovered a subglenoid dislocation which he reduced; and that, if there had been such dislocation, it had been successfully reduced. As the evidence of all the physicians was to the effect that a subglenoid dislocation could readily be discovered, the jury was warranted in finding that defendant had negligently failed to discover and reduce such a dislocation, and that plaintiff was entitled to recover damages resulting from such negligence.

If, as counsel for appellant insist, the verdict found on this evidence is not to be allowed to stand, it must be that it is insufficient, either on account of the inherent improbability of the evidence, or on account of evidence introduced for the defendant so conclusively contradicting it that it should not have been believed by the jury. As to inherent improbability, all that need be said is that neither the jurors nor the trial judge should be presumed to have such technical knowledge of anatomy and surgery as to be qualified to pass on the improbability of evidence depending on such scientific knowledge. Although such a dislocation as Dr. Heetland described could have been readily discovered, that fact would simply tend to show the negligence of defendant in not discovering it, and as against evidence tending to show negligence, we would not be justified in entertaining so strong a presumption that the defendant was not negligent as to overcome the evidence of negligence which the plaintiff introduced. Negligence was the very thing which plaintiff was seeking to establish, and, however reluctant the court or the jury might have been to believe that a reputable physician

would overlook so patent a condition, there would be no
necessity to find, in the face of plaintiff's evidence, that
on the ground of mere presumption of care on defendant's
part such evidence should not be believed.  If it is to be
said that the verdict is without support in the evidence,
and the result of passion and prejudice (no other showing
as to passion or prejudice being made), it must be on the
ground that the testimony offered by defendant shows con-
clusively, either that there never was a dislocation of
plaintiff's shoulder, and that Dr. Heetland was mistaken
in testifying that such a dislocation, so easy, according to
the testimony of all the expert witnesses, to diagnose, did
not exist, or that such dislocation occurred between the
time that defendant examined and treated the shoulder
and the time when plaintiff applied to Dr. Heetland for
treatment.  The latter hypothesis is purely speculative, and
negatived by the testimony for plaintiff.  There is not the
slightest basis for any claim that such a dislocation as Dr.
Heetland discovered and reduced, as he testifies, arose other-
wise than from the injury for which plaintiff was treated
by the defendant.  The only question, then, for our con-
sideration in determining whether the verdict is supported
by the evidence is as to whether plaintiff's shoulder was in
fact ever dislocated.  As already indicated, there is abun-
dant evidence of such dislocation found in the testimony
of plaintiff and his witnesses, and in an ordinary case we
should go no further; but, as the circumstances are pe-
culiar, and as it is insisted that the expert evidence
showed beyond question the impossibility of the existence
of the condition to which plaintiff and his witnesses tes-
tified, we find it necessary to state the nature of the evi-
dence introduced in defendant's behalf to overcome the
apparent case made out for plaintiff.

The defendant himself, a practicing physician and
surgeon of thirty-three years experience, a graduate of a
reputable medical college, testified that, when called to

attend plaintiff immediately after his injury, he examined the shoulder very closely, and found no indication of a dislocation. He applied the "Dugas test," which all the witnesses say is a proper one for discovering a dislocation of a shoulder, and reached the conclusion that no dislocation existed. This test consists, as we understand it, in placing the patient's elbow against his chest, and then having him place his fingers, if possible, on the opposite shoulder. If the patient is able to raise the fingers of his injured arm to the opposite shoulder while his arm is in this position, there can be no dislocation at the shoulder. Defendant testified that when he applied this test plaintiff was not able of himself to raise the fingers of his right hand higher than his left armpit, but that by the witness's assistance the fingers were carried as high as the left shoulder. Defendant testified further to giving such treatment to the plaintiff as was proper for an injured and bruised shoulder without dislocation. He accounted for abscesses, which formed in the armpit, by blood poisoning due to the absorption of poisonous matter through the bruised skin of the arm, and caused counter-irritant plaster and liniments to be applied to the shoulder to relieve plaintiff from the pain which he thought might be due to rheumatism. It may be said here that plaintiff and his witnesses deny the existence of any such breaking of the skin as would allow the absorption of poisonous matter from without, and the jury would have been justified in believing under the evidence that the abscesses in the armpit were due to the internal condition of the shoulder rather than poisonous matter absorbed from the outside.

Five physicians, as experts, testified with reference to the proper diagnosis and treatment of subglenoid dislocations; but only two of these had ever in fact seen a subglenoid dislocation (the common dislocation being a subroracoid, in which the head of the humerus is forward of, instead of below, the socket), and each of these two

had seen only one case, but they all testified from their general knowledge of surgery that the arm would stand out from the body, and the elbow could not be brought down to the side without great pain to the patient. They further testified that after ten weeks the dislocated head of the humerus would become so attached in its unnatural position by the formation of abnormal tissues or adhesions that it could only be loosened so as to be brought into normal position by long manipulation or incision, and they unqualifiedly expressed the opinion that Dr. Heetland could not possibly have reduced such a dislocation in a few minutes by the operation which he described. Substantially, then, the inconsistency between the expert testimony introduced for defendant and the direct testimony for the plaintiff was first as to the position in which plaintiff carried his arm during the time he was being treated by defendant, and second as to the feasibility of the method of reduction which Dr. Heetland employed. As to the position in which plaintiff carried his arm there is no very conclusive showing either way. He went about, as appears, with his arm in a sling or sometimes without support, but whether it hung close to his side, or stood out at an angle, is not positively shown. The testimony of two of defendant's expert witnesses that the arm would, in the case of a subglenoid dislocation, stand out at a very considerable distance from the body is not strongly supported by the cut showing the position of an arm in case of such dislocation. It would appear from this cut, which all the witnesses agreed was correct as indicating the usual position of the arm under such circumstances, that the arm does stand out to some extent from the body, but it certainly does not stand out, as one or two of the witnesses said it should, almost at right angles, and we are unable to say from the examination of this cut that it would be in no case possible for one suffering from such a dislocation to carry his arm in a sling, or to go about with his hand

held up to his chest. Nor would the invaried length of the arm be such as to attract attention, for defendant himself testified that it would only be out seven-eighths of an inch longer than in its natural condition. We think we could not say, as a matter of law, that the condition of the arm as testified to by plaintiff and his witnesses was absolutely inconsistent with the possibility of such a dislocation as Dr. Heetland testified that he found when he examined plaintiff's shoulder.

As to the impossibility of reducing such a dislocation by the method which Dr. Heetland resorted to, we must exclude from consideration what is said by the witnesses as to the danger attending such a method. We are not now concerned with the question whether Dr. Heetland was negligent in resorting to the methods employed. It might be that had blood vessels been ruptured and nerves destroyed, or had the scapula been pulled loose from its mooring, Dr. Heetland would have been liable in damages for malpractice. The question for us is whether in fact a dislocation was reduced. In answer to the claim that, by testimony of witnesses, such a reduction would be impossible without incision after ten weeks' standing, it is enough to notice that two of defendant's witnesses described cases in which shoulder dislocations of at least several weeks' standing have been reduced by manipulation without any incision. The impossibility which they insisted upon was in so loosening the adhesions that the simple operation resorted to by Dr. Heetland would bring the head of the humerus back into its natural socket. They agree that in some cases of shoulder dislocation existing for a considerable period this might be done by manipulation, and we cannot find that under the evidence it would have been impossible for Dr. Heetland to succeed in reducing such dislocation in the method employed. The question comes down to this, How strong would be the adhesions formed after a dislocation had existed for ten

weeks, and how much manipulation would it be necessary to use in loosening these adhesions so that the bone could be forced into its natural socket? We are not justified under the evidence in assuming that the abscesses in the armpit might not have interfered, to some extent, with the formation of the adhesions testified about, nor are we justified in saying that these adhesions would in every case be as strong as the testimony of defendant's experts would tend to indicate as the general result in such cases, nor would we be justified in saying that the manipulations to which Dr. Heetland and his assistants testified would not, in this particular case, have broken up these adhesions. With reference to this matter it is to be noticed that, as Dr. Heetland and his assistants testified, they made one successful effort to reduce the dislocation by pulling out the arm at right angles and drawing it down by the side, and that afterward, on the administration of a stronger anæsthetic, they were able to bring the bone back into its natural socket by the method above described, and in a very short period of time. Now, we think it was for the jury to say whether, in view of the manipulation which the bone actually had, as described by Dr. Heetland, and the uncertainty as to how strong the adhesions may have been in the particular case, it was impossible that Dr. Heetland reduced a dislocation as he testified. In the case of conflicting expert evidence (for Dr. Heetland was fully qualified to testify as an expert) it certainly must be a question for the jury to determine the weight to be given to the testimony of the witnesses under the circumstances of the case. The jurors were not bound to wholly disregard Dr. Heetland's testimony, because experts on the other side said, as a result of general knowledge on the subject, that a dislocation could not be reduced in the manner described, or that it would be very unwise to attempt to do so.

We find that there was some evidence, although by

no means conclusive, that there was a condition of the shoulder after the injury indicating a dislocation, that subsequently a dislocation was discovered, existing as the result of such injury, and that defendant was negligent in not discovering and attempting to reduce such dislocation.

We have discussed the evidence at greater length than would usually be proper, and have indicated the grounds of our conclusion that there was enough evidence to sustain the verdict of the jury.

The judgment is therefore *affirmed.*