STATE OF IOWA, Appellee, v. EARL BOGARDUS et al., Appellants.

**ROBBERY:** Evidence—Sufficiency. Evidence held to present jury
1 question as to defendant's guilt.

**INDICTMENT AND INFORMATION:** Amendment. An indefinite
2 allegation of the ownership of property may be made definite
by amendment.

**CRIMINAL LAW:** Verdict-urging Instructions. Instructions urg-
3 ing upon the jury the desirability of a verdict are not objec-
tionable when nothing coercive appears from the language
thereof, or from the actions of the jury.

**CRIMINAL LAW:** Separation of Jury. A slight separation of
4 jurors, concededly without prejudice, cannot be denominated
reversible error.

*Appeal from Jefferson District Court.*—C. W. VERMILION,
Judge.

FEBRUARY 16, 1920.

REHEARING DENIED MAY 11, 1920.

DEFENDANTS were tried, and found guilty of the crime
of robbery. Judgment was pronounced that one of them be
imprisoned in the penitentiary at Fort Madison, and the
other in the reformatory at Anamosa. The defendants
appeal.—*Affirmed.*

*Jaques, Tisdale & Jaques,* for appellants.

*H. M. Havner,* Attorney General, *Charles W. Lyon,*
Assistant Attorney General, and *Richard C. Leggett,* County
Attorney, for appellee.

PRESTON, J.—Four grounds are relied upon for rever-
sal. Briefly, they are: The alleged insufficiency of the
evidence; that the court permitted an amendment to the

indictment; the giving of an additional in-

**1. ROBBERY:**
**evidence:**
**sufficiency.**

struction; and lastly, that the jury were permitted to separate while deliberating on their verdict.

1. It appears that, on Sunday night, August 11, 1918, at about 10:30 or 11 o'clock, an automobile, driven by one Peacock, in which Clarence Faulds and Verdie Hoskinson, the prosecuting witnesses, and one Barker were riding, was held up by two masked men, one tall, the other small. Faulds was robbed of a gold watch and $90 in money, and Hoskinson of a diamond ring. The robbery took place at a bridge between Fairfield and Ottumwa, three miles east of Fairfield. No question is raised about the robbery's having been committed. The evidence will not be stated in detail. The acquaintance of the witnesses with defendants, the manner in which the robbers were dressed, the presence of the different ones in Fairfield, and other details, are given. After the robbery, Barker, Faulds, and Hoskinson were compelled to descend into the ditch near the bridge, and Peacock was compelled to turn his car around, and drive the robbers back east towards Fairfield. When the robbers reached a Ford car, which the occupants of the Peacock car had noticed standing at the side of the road, as they went west, they alighted, and got into their car and went on east. Peacock and a boy went back and met the other three victims, walking towards Fairfield. The victims had, in the meantime, telephoned to the sheriff. Faulds testifies that he recognized the two defendants as the parties who held them up that night. He testifies that Connell was in the restaurant when he had supper, before the robbery, and that Connell saw what witness had in his pocketbook. He testifies that he had met defendants and others in a crap game, two weeks before, and Bogardus in another crap game, the afternoon before the robbery. He heard Bogardus talk, and noticed that he talked through

his nose. He had seen Connell two or three times. At the crap game in the afternoon, Peacock said he was "broke," and Bogardus was trying to get some money. Before the robbery, he saw a couple at the side of the road, with the reflection from the Peacock light. The robbers had guns and a flash light, one on each side of the auto. One was a tall, slender fellow, stoop-shouldered; had on a long tan or sheepskin coat. The other had on a pair of overalls, which were too large for him. The small man had a small automatic gun, and the other a large one. The small man walked up to witness, put his gun into witness' ribs, as he puts it, and went through him, but couldn't find his pocketbook. They first said, "Get that watch;" and witness gave them his watch. They got $4.00 or $5.00 in silver that witness had in his pocket, but they did not seem to be satisfied, and they went through witness two or three times; couldn't find the pocketbook. The big fellow said, "Got it all?" and the other said, "No." They went through him again, and the larger man told the smaller to look in the back seat of the car, and they found the pocketbook. He recognized Bogardus by the way he talked, through his nose; also, by the way he was dressed. Bogardus did most of the talking. The other man was small, and he could tell when he went through him. This witness is corroborated by Hoskinson, who testifies of a crap game, that morning and afternoon, at which Bogardus was present,—at least at the first game. Witness saw Faulds have some money in his possession that afternoon, and a gold watch. Witness had a diamond ring, and some money, at the game in the park. Later, he went to a restaurant, and saw both defendants. Hoskinson says he had known Connell for 10 or 12 years; had met him when he was going to school in Fairfield, and had seen him since, in Ottumwa, and Fairfield.

The State's witnesses are contradicted by witnesses

for the defendant. Peacock says that neither of the robbers were the defendants. His evidence was considerably shaken on cross-examination, and the State contends that the diamond ring which was taken from the finger of Hoskinson proved to be the undoing of Peacock on cross-examination. There is evidence of a telephone call by Peacock, from Chicago, to Connell, and of the going to Chicago of Connell and Bogardus. We shall not go into the details of this transaction. The jury had it all. He testifies as to his intimacy with Connell, and about losing a diamond ring in a cabaret in Chicago; about its being in pawn, and about different girls' wearing it. He tries to make it appear that the ring he had was not the one taken in the robbery. He testifies about seeing Faulds and Hoskinson at the crap game on the afternoon of the day of the holdup, and that he took part in the game. He says:

"I didn't notice these two boys any more than any of the other boys. I walked down the railroad with them. Well, there wasn't much talk about crooked dice. They simply mentioned they had a pair of shapes, and if there was any suckers around town, we could trim with them. We didn't say anything. We were about as smart as they were, when it comes to shooting craps. I don't know as we were any better. I don't think they could learn us anything about shooting dice."

Barker says that neither of the robbers looked like the defendants.

The mother and brother of Bogardus gave testimony, tending to establish an alibi for him, and say that he was at home, about 10 or 11 o'clock that night. A waitress at the cafe thinks Connell was in the restaurant all the time from 8 or 9 o'clock in the evening until after the holdup.

Without going into details, this is a brief summary of the evidence. A number of people were in the restaurant, and the waitress may have been engaged in her duties,

and not noticed particularly any particular person continuously for two or three hours. Evidence as to alibi is not always trustworthy, when given by relatives, and when they do not attempt to fix the time accurately, or within an hour or so, as in this case. Defendants do not state where they were. They were not witnesses. The credibility of the witnesses and the weight to be given to their testimony as to the identification of defendants are sufficient to sustain the finding of the jury.

2. The indictment, as originally drawn, omitting caption and signature of the county attorney, is as follows:

2. INDICTMENT
AND INFORMA
TION:
amendment.

"The grand jury of the county of Jefferson, in the name and by the authority of the state of Iowa, accuses Earl Bogardus and Fred Connell of the crime of robbery, committed as follows:

"The said Earl Bogardus and Fred Connell, on or about the 11th day of August of the year of our Lord 1918 in the county aforesaid, did, by force and violence and by putting in fear, steal and take from persons of Verdie Hoskinson and Clarence Faulds, property that is subject of larceny, to wit, one gold watch, one diamond ring, and $90 lawful money of the United States, contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the state of Iowa."

The county attorney was permitted to amend the indictment in regard to the ownership of the property, as follows:

"Which said gold watch and $90 lawful money of the United States were then and there the property of and owned by the said Clarence Faulds, and which said diamond ring was then and there the property of and owned by the said Verdie Hoskinson."

The thought of appellant is that the indictment, as originally returned, charges, and is a good indictment for,

VOL. 188 IA.—82

assault with intent to rob, and that, in such an indictment, it is not necessary, under the holding in *State v. Gulliver*, 163 Iowa 123, to allege the ownership of the stolen property. They argue, too, that an assault with intent to rob is a degree of the crime of robbery. They then argue that the indictment, when amended, charges a different degree of crime from that charged in the original indictment, contrary to Section 5289, Code Supplement, 1913.

We think the argument is built up on the assumption that the indictment originally charged only assault with intent to rob.' The original indictment does not specifically charge any assault, but simply charges that, by force and violence, and by putting in fear, the defendants did steal and take from the persons of Hoskinson and Faulds property, etc. It charges robbery, and the original indictment itself, we think, comes very near alleging the ownership of the property, and does so, by implication at least. The amendment does not charge a different crime or different degree of crime from that charged in the original indictment, but simply makes more specific the allegation concerning the ownership, which is expressly permitted in the statute before cited. We think this case, at this point, is ruled by *State v. Kiefer*, 172 Iowa 306.

3. After the jury had deliberated on their verdict about 30 hours, the court gave the following additional instruction:

"This case has been exhaustively and carefully tried by both sides, and at considerable expense, and has been submitted to you for decision and verdict,—not for disagreement. The law requires an unanimous verdict; and while this verdict must be the conclusion of each juror, and not a mere acquiescence of the jurors to reach an agreement, it is necessary for all of the jurors to examine the issues submitted to you with candor, and a proper regard and

3. CRIMINAL LAW: verdict- urging instruc- tions.

deference to the opinion of each other. A proper regard for the judgment of other men will greatly aid us in forming our own. This case must be decided by some jury, selected in the same manner this jury was selected, and there is no reason to think a jury better qualified would ever be chosen. Each juror should listen to the argument of other jurors, with a disposition to be convinced by them; and, if the members of the jury differ in their views of the evidence, such difference of opinion should cause them all to scrutinize the evidence more closely, and to re-examine the grounds of their opinion. Your duty is to decide the issue of facts which has been submitted to you, if you can conscientiously do so. In conferring together, you should lay aside all mere pride of opinion, and should bear in mind that the jury room is no place for espousing and maintaining in a spirit of controversy either side of a cause. *The aim ever to be kept in view is the truth, as it shall appear from the evidence, examined in the light of the instructions of the court.* You will again retire to your jury room, and examine your differences in a spirit of fairness and candor, and try to arrive at a verdict."

The jury returned, an hour and a half after the giving of this instruction. The jury were not kept out so long after the giving of this instruction as to indicate coercion, and the fact that they deliberated an hour and a half afterwards shows that they were not coerced by the giving of it. In the *Peirce* case, infra, at 426, it was said that it seems to resolve into whether the relative time spent in deliberation may raise a presumption of prejudice against the instruction. Appellant cites the following cases, where a similar instruction was criticized: *Clemens v. Chicago, R. I. & P. R. Co.*, 163 Iowa 499; *State v. Mulhollen*, 173 Iowa 242; *State v. See*, 177 Iowa 316; *State v. Peirce*, 178 Iowa 417. The State cites the following cases to sustain the instruction: *State v. Lawrence*, 38 Iowa 51, 57; *State v. Hale*, 91

Iowa 367, 370; *State v. Olds,* 106 Iowa 110, 117; *State v. Tripp,* 113 Iowa 698, 708; *State v. Richardson,* 137 Iowa 591, 594; *Burton v. Neill,* 140 Iowa 141, 143; *State v. McGhuey,* 153 Iowa 308, 317; *State v. Jackson,* 156 Iowa 588, 598; *State v. Concord,* 172 Iowa 467, 476; *State v. Mulhollen,* 173 Iowa 242, 248; *State v. Levich,* 174 Iowa 688, 696; *State v. See,* 177 Iowa 316, 319; *Armstrong v. James & Co.,* 155 Iowa 562, 564; *Clemens v. Chicago, R. I. & P. R. Co.,* 163 Iowa 499, 506; *State v. Peirce,* 178 Iowa 417, 422.

We have seldom reversed for the giving of such an instruction. Some of the cases approve, without qualification, instructions similar to this; other cases criticize and disapprove, without reversing. The question has been fully discussed and the cases reviewed in the *Peirce* case, and we need not now repeat the discussion. In the instruction now under consideration, the trial court eliminated the language which was thought to be objectionable in some of the cases. For instance, in some of the cases, the instruction contained this language:

"Such difference of opinion should induce the minority to doubt the correctness of their own judgment," etc.

In the instant case, the court eliminated the objectionable language contained in the *Clemens* case, cited and relied upon by appellant. The *Peirce* case contained similar language. There were the further circumstances in the *Peirce* case, that three of the jurors stood for acquittal, when the instruction was given; it was late Saturday night, and it got into the jury room that the trial judge had gone home for Sunday. It was said that these circumstances fairly conveyed to the jury that failure to agree meant confinement over Sunday. The more recent cases are bottomed upon the case of *State v. Richardson,* 137 Iowa 591, 594, where a similar instruction was approved. See, also, *Armstrong v. James & Co.,* supra.

The record does not show how the jury stood at the time the instruction was given in the instant case. In the *Peirce* case, the jurors had been kept together 11 days, before entering upon their deliberations in the jury room, and there had been 48 hours of disagreement, before the instruction was given, and there was, as said, the further thought in the minds of the jurors of further confine- ment over Sunday. In the *Mulhollen* case, we said that there was a better reason for approving the instruction in the case than there was in the *Richardson* case.

We shall not discuss the different features and circum- stances of all the cases cited on this point. Such an in- struction is not always appropriate, and whether it shall be given is largely within the sound discretion of the district court; and the circumstances in this case are such as to bring it within the discussion of the case of *State v. Peirce,* supra.

4. Lastly, it is contended that there was misconduct of the jury, in that, after the case was submitted, one of them, while being conducted from the restaurant where the jurors had eaten their supper, entered a restaurant, while the remaining 11 pro- ceeded along the street; and on another occasion, the same juror, or one of the others, entered a livery stable, while the jurors were being taken past, and either fed his horses or unharnessed them. As we understand the record, it was the same juror who went into the restaurant and the livery stable. The affi- davit of the bystander who saw the juror go into the restaurant does not name the juror. These facts were shown by the affidavits of the bystander and the affidavits of the juror. The juror says he went into the restaurant, and, on another occasion, to feed his team; that the bailiff was at the front entrance. Neither of the affidavits shows that the juror spoke to anyone, or that anyone spoke to

4. CRIMINAL LAW: separation of jury.

him. The affidavit of the bailiff states that he had personal charge of the jury when they were at their meals, at the times in question; that he accompanied them when they left the restaurant, and returned with them to the court house; that, if the juror entered the restaurant, it could not have been for more than a minute, and did not delay the return of the jurors to the court house; that, when the juror went into the barn to feed his horses, he remained within sight and hearing of all the jurors, and that it took but about five minutes, during which time none of the jurors communicated in any manner with any person other than the members of said jury; and that no person at any time, during the deliberations of the jury, or in any manner, communicated with the jury, to his knowledge. All the jurors, including the one before mentioned, filed an affidavit, in which they say that they did not, in any manner, communicate with any person other than the members of the jury, during their deliberations, or at any time from the time they were sworn until after the verdict, with respect to or in any manner concerning any of the things related to or connected with or in any manner concerning said cause. It is contended by appellants that the matters complained of violate Section 5387 of the Code. Appellants say that, by the separation of the jury, as shown, opportunity for prejudice existed. They say that they do not know what took place in the restaurant or livery barn, but say that the affidavits show that the jury were not kept together, while deliberating on their verdict. Appellants also make this concession, in argument, that they do not claim to have shown any prejudice on account of these acts. No cases are cited by appellants.

We have a case, then, where no prejudice is shown, and that fact is conceded by appellants, and the record shows affirmatively that there was no prejudice. There was no reversible error at this point. *State v. Wart,* 51 Iowa

587, 589; *State v. Wright,* 98 Iowa 702; *State v. Lindsay,* 161 Iowa 39, 43; *State v. Cowan,* 74 Iowa 53; *State v. Griffin,* 71 Iowa 372; *State v. Fertig,* 84 Iowa 79; *State v. Bowman,* 45 Iowa 418.

No reversible error appearing, the judgment is— *Affirmed.*

WEAVER, C. J., concurs in the result. EVANS, J., concurs. SALINGER, J., concurs specially.