STATE OF IOWA, Appellee, v. GEORGE PEIRCE, Appellant.

**TRIAL:** Instructions—Verdict-Urging Instructions—Coercing Jury
1  —Presumption—General Rules. Verdict-urging instructions, additional to the general instructions given, though technically correct, are governed by the following general rules:

1. They should not be given except in extreme cases.

2. Whether the giving of such be reversible error depends on whether it may be fairly said or presumed, in view of the conditions attending the giving, that they coerced or helped to coerce the jury into an agreement, or whether they simply started a new train of real deliberation, which ended the disagreement.

3. Where the disagreement prior to such giving is of more than ordinary duration, and, after the giving of such instructions, a verdict is reached in a time short in comparison with the dura-

tion of the former disagreement, *a presumption arises that the instructions were prejudicial.*

PRINCIPLE APPLIED: In the trial of a chief of police for conspiracy to protect prostitutes and liquor dealers in their violations of law, the jury had not been permitted to separate prior to the submission of the case, a period of 11 days. The evidence was in sharp conflict as to defendant's guilt. After the jury had deliberated for 2 days, they stood 9 for conviction and 3 for acquittal. The court then, which was late on Saturday night, additionally instructed them as to the desirability of arriving at a verdict, but expressly stated to them that the court was not intimating to them, in the slightest degree, what the verdict should be. The statement got into the jury room that the trial judge had gone to his home, out of town, to spend Sunday, and that another judge, who lived in town, could act only to receive a verdict. This statement, the appellate court said, *arguendo,* fairly conveyed to the jury that failure to agree meant confinement over Sunday, at least. The jury agreed on a verdict of guilt within 4 hours after the verdict-urging instructions were given.

*Held,* the conditions raised a presumption of prejudice.

*Held,* also, the case should be reversed on account of *other* quite numerous prejudicial errors.

**CRIMINAL LAW:** **Trial—Misconduct of Jury—Reading Newspapers in Violation of Order—Innocence of Bailiff.** The reading, in violation of an order of court, by jurors in a criminal case, in the trial of which they were not permitted to separate, of accounts in a reputable newspaper, of the arrest of a witness for defendant for perjury committed in the trial of said cause, *without direct adverse comment as to defendant,* is reversible misconduct; and it is immaterial that the bailiff was entirely innocent of any wrong in said matter.

**CRIMINAL LAW:** **Trial—Misconduct of Jury—Reading of Newspapers—Burden of Proof as to Prejudice.** Defendant in a criminal cause need not affirmatively show that misconduct of a jury in reading prejudicial newspaper accounts relating to the trial, was the cause, or partial cause, of the verdict of guilt; because to so require would be to require the impossible, to wit, *show a fact which inheres in the verdict.*

**CRIMINAL LAW:** **Appeal—Concession That Guilt Was Jury Question—Effect.** A defendant in a criminal cause who does not raise the question that the evidence is insufficient to sustain the verdict, may still insist that the reading of prejudicial newspaper articles was presumptively prejudicial, as interfering with a proper

weighing of the evidence. In other words, failure to raise such question cannot be treated as a concession that the trial was fair.

**CRIMINAL LAW: Trial—Misconduct of Bailiff—Improper Communication with Jury.** It is prejudicial misconduct for a bailiff to inform a jury that the trial judge had gone to his home out of the city to spend Sunday, and that another judge who did reside in the city of the trial had no power except to receive a verdict. (See Section 5387, Code, 1897.)

**JURY: Qualification—Bias.** Whether a juror who had expressed grave doubt of his ability to disregard what he had learned, and to give the defendant a fair trial, in the case at bar, in view of the uncertainty surrounding his testimony on *voir dire*, was a competent juror, *quaere*.

**CRIMINAL LAW: Trial—Misconduct of Court—Directions to Bailiff.** The objection that the court directed the bailiff in regard to preventing interference with the jury in such a way as to frighten the jury, and in regard to clearing the court room on occasion of disorder, held, in the case at bar, to be purely hypercritical.

**CRIMINAL LAW: Trial—Misconduct of Court—Incorrect Statement of Law—Harmless Error.** Statement by the court to the jury that the statute *required* the jury to be kept together, pending and during the trial, is, if erroneous, entirely harmless.

**CRIMINAL LAW: Trial—Misconduct of Judge—Unwarranted Reprimand of Counsel.** The court's reprimand of defendant's counsel for asserting, at the close of the State's case, that the prosecutor had stated that he would recall a certain witness (which assertion was substantially correct, though vigorously denied by counsel for the State), was unwarranted, but not reversible error.

**CRIMINAL LAW: Trial—Misconduct of Court—Unjust Imputation on Counsel.** Remarks by the court, for which there was no foundation in the record, quite strongly inferring that counsel for the defendant had so interfered with the witnesses for the State that it was necessary for counsel for the State to lead them in their examination, is prejudicial error, even though the court, at once, on demand that the remark be withdrawn, disclaimed any intention of charging counsel with tampering with the witnesses.

**CRIMINAL LAW: Trial—Misconduct of Counsel—Argument.** It is not misconduct for counsel for the State, in argument on the trial of a police officer for conspiracy to protect lawbreakers, to assert: (a) that citizens no longer carry weapons, and are prohibited from doing so because of reliance on performance of duty by police officers; (b) assumption that the jury desired a verdict

which would make them feel that they had properly acquitted themselves of their duty, and were entitled to the approval of their fellow citizens; (c) that the case had excited unprecedented interest in the community, and that most careful consideration was due, so that a fair and just verdict might be rendered.

**CRIMINAL LAW:** Trial—Misconduct of Counsel—Argument. Insinuating, even in some slight degree, without justification in the record, that witnesses had been suppressed or intimidated, is error, though not necessarily prejudicial.

**CRIMINAL LAW:** Trial—Misconduct of Counsel—Argument. It is not misconduct for counsel for the State to assert in argument that defendant is guilty, and, in substance, that the jury could not justify itself with any citizen in acquitting the defendant, in view of the convincing array of evidence against him, and the withholding of the only testimony that the State knew of that could corroborate defendant, that of a named saloon keeper.

**CRIMINAL LAW:** Trial—Misconduct of Counsel—Argument. Highly inflammatory remarks by counsel in argument, especially *in the trial of a chief of police charged with conspiracy to protect lawbreakers*, without a record to justify it,

(a) enlarging upon the fearful prevalence of all kinds of infamous crimes in the community;

(b) asserting, at length, the miscarriage of justice in the trial of a criminal case a year previous; and

(c) asserting that defendant is guilty of thousands of crimes other than the one on trial,

is misconduct such as to demand the reversal of a verdict of guilt.

**CRIMINAL LAW:** Trial—Misconduct of Counsel—Argument. It is highly improper for counsel in argument to assert, without anything in the record to justify it, that a witness for defendant is a dope fiend.

**CRIMINAL LAW:** Trial—Misconduct of Counsel—Argument. Reversible misconduct may arise out of highly inflammatory remarks by counsel in argument, without record evidence to justify it, concerning a party *who is neither a party to the proceedings nor a witness therein.*

PRINCIPLE APPLIED: A chief of police was on trial for conspiracy to protect prostitutes and liquor dealers in their infractions of the law. The State had shown that a successful raid had, during the defendant's incumbency in office, been made on a place kept by one Flanagan. In the closing argument, counsel for State, without any record evidence to sustain it, asserted that Flanagan

was then in the county jail and would be tried for murder, and that his place was the resort of the murderer, burglar, robber, pickpocket and thief, and had been protected. *Held*, the argument constituted reversible error.

**CRIMINAL LAW:** Trial—Misconduct of Counsel—Argument Improper and Naturally Prejudicial—Waiver—Cure. No failure on the part of counsel to object can waive, and no act on the part of the court can cure, the error of an argument *clearly improper and naturally prejudicial.*

**WITNESSES:** Examination—Leading Questions. Questions reviewed, and held not leading.

**TRIAL:** Reception of Evidence—Objection Neutralized by Objection. An objection may be neutralized by another objection by the same party.

**WITNESSES:** Cross-Examination—Truthfulness of Witness. To test the truthfulness of a witness is one of the very purposes of cross-examination, and any question to that end, within reason, and bearing directly on a material assertion made by him, is proper. Therefore, *held* that a chief of police who was on trial for conspiracy to protect law violators, and who had, on direct examination, denied, in effect, that there were any violations of law which had been permitted by him, was properly cross-examined as to his knowledge of violations of law *at particular places* within his jurisdiction, not mentioned by him on said direct.

**WITNESSES:** Examination—Systematically Leading Witnesses—Effect. A course of *systematic* leading of witnesses may demand the reversal of a cause when any *one* of such questions would not be given such effect. Examinations reviewed, and held to present a reversible record under such principle.

**EVIDENCE:** Hearsay—General Principle Applied. On the trial of a chief of police for conspiracy to protect lawbreakers, evidence of what arrested parties said on the trial of another, arrested with such declarants, is hearsay.

**WITNESSES:** Examination—Impropriety in Form. It is improper for an attorney to say to a witness under cross-examination, "I don't want you to lie about it; what is the fact?"

**WITNESSES:** Examination — Admission of Memory-Refreshing Books. A witness may so rely on a book, in refreshing his memory, as to effectually *make the book itself a witness*, and demand its reception as an entirety, regardless of private memoranda therein.

**WITNESSES:**    Impeachment—Character   Impeachment—Source  of
**25  Livelihood.**  The debased source of livelihood and financial means
with which a witness is enabled to enter into business may become
a legitimate source of cross-examination for character-impeaching
purpose.  So held where defendant sought to show that a hostile
witness was living and doing business on the wages of his wife's
sin.

*Appeal from Woodbury District Court.*—JOHN W. ANDERSON,
Judge.

FRIDAY, NOVEMBER 17, 1916.

FROM a conviction upon an indictment charging him with
conspiracy to do illegal acts injurious to the public morals,
police and to the administration of public justice, the defend-
ant appeals.—*Reversed* and *Remanded.*

*Henderson & Fribourg* and *Paul M. Hatfield,* for appel-
lant.

*George Cosson,* Attorney General; *John Fletcher,* Assist-
ant Attorney General, and *O. T. Naglestad,* County Attorney,
for appellee.

SALINGER, J.—I.    There being good reason to believe that
the jury would disagree, they were given an additional instruc-
tion, which is now complained of, and which, in substance,
charged as follows:

1. TRIAL: instruc-          That it should be the aim of the jury to
tions: verdict-
urging instruc-      reach a verdict if it could conscientiously do.
tions: coercing
jury: presump-      so; that the object of submitting causes was
tion: general
rules.              agreement, and not disagreement; that while,
of course, the verdict should be that of each juror freely as-
sented to, each should listen with respect to the arguments of
his fellows; that being strongly in the minority should incline
one to re-examine the ground of his opinion; that mere pride
of opinion and a spirit of controversy had no place in the jury
box; that retrials were burdensome and expensive; that some

jury must decide the case, and there was no reason to believe another would be better qualified than the present jury, or that it would have more or clearer evidence.

Now while, among the cases cited, *State v. Pitts,* 11 Iowa 343, 346, merely determines the abstract proposition that it is not error to give an additional instruction, *State v. McGhuey,* 153 Iowa 308, decides no more than that the court may properly tell the jury that it should not be deterred from reaching a verdict by considerations of the severity of possible punishment; one holding of *State v. Richardson,* 137 Iowa 591, at 596, is merely that it is no abuse of discretion to give an additional instruction after a jury has failed to agree, upon 17 hours of deliberation; while perhaps *Delmonico v. Smith,* 112 Iowa 659, is not a controlling authority, because the exact conditions and facts do not appear in the opinion, and the record does not indicate what happened after the additional instruction was given; and while the circumstances were so different in *State v. Olds,* 106 Iowa 110, as to make that case of little value on the present controversy, *Niles v. Sprague,* 13 Iowa 198, *Frandsen v. Chicago, R. I. & P. R. Co.,* 36 Iowa 372, *German Sav. Bank v. Citizens' Nat. Bank,* 101 Iowa 530, at 547, *State v. Tripp,* 113 Iowa 698, *Burton v. Neill,* 140 Iowa 141, *Jackson v. State,* 91 Wis. 253 (64 N. W. 838), *Warlick v. Plonk,* 103 N. C. 81 (9 S. E. 190), *Ahearn v. Mann,* 60 N. H. 472, have, taken together, approved every part of this instruction; and *State v. Richardson,* 137 Iowa 591, and *Armstrong v. James,* 155 Iowa 562, in effect, approve it in its entirety. On the other hand, in *Clemens v. Chicago, R. I. & P. R. Co.,* 163 Iowa 499, we reverse because of an instruction substantially like it. The dissent of Mr. Justice Weaver in the *Armstrong* case, supra, presents a most formidable argument against the giving of the instruction in that case; and in cases where we sustain the verdict, we have inclined to view such an instruction with disapproval. *State v. Mulhollen,* 173 Iowa 242, 248, and *State v. See,* 177 Iowa 316. But, on careful analysis of all these cases, there is no decision

that such an instruction should never be given, and no more is held than that it depends upon the conditions under which its language is used, whether there is reversible error. We must, then, turn to the conditions existing when such an instruction as this was respectively approved or disapproved, compare them with those surrounding the giving of the one here complained of, and deduce therefrom, if we can, some general rule whereby it may be determined when it is either proper or improper to charge as was done here. We must keep in mind that the trial court is vested with a reasonable discretion in the premises, and that the instruction at bar is free from at least one fault which has condemned such, namely, an intimation which party was favored by the court; for here the jury was told expressly that it was not intimated to them in the slightest degree what the verdict should be.

We have intimated strongly that such instructions are erroneous if their language (1) indicates an intention to coerce into agreement, or (2) suggests that the jury would be kept together until it agreed. *German Sav. Bank v. Citizens' Nat. Bank*, 101 Iowa 530, at 547; *State v. McGhuey*, 153 Iowa 308. The ultimate test would seem to be whether the additional instruction forced or helped to force an agreement, or whether it merely started a new train of real deliberation which ended the disagreement. In the *Armstrong* case, much stress is laid upon the fact that the jury requested additional instructions, after the first, alleged to have been coercive, had been given, of which it is said that it indicates that the merits of the case were being considered, and the jury "had got to the very vitals thereof. . . . The instruction complained of did not of itself hasten the verdict. It did not come until the additional instruction was given." It is further pointed out that the jury was reluctant to be discharged, and asked for further time.

We say in *Richardson's* case that the length of time spent in deliberation after the giving of the instruction "clearly indicates that they were not misled by the instruction." It is

very suggestive that, in the main, in the cases wherein the instruction was approved, the jury deliberated a shorter time before the additional instruction was given, and reached a verdict more slowly after the instruction was given, than in the *Clemens* case, where the instruction was disapproved, and in the present case. The argument in the *Clemens* case that, where the jury remains out long after being additionally charged, physical exhaustion may be a factor in agreement, is sound, but it does not change that there is more reason to doubt the quality of the verdict when the disagreement is of great length, and agreement after the additional instruction is given comes in a comparatively short time, than where substantially opposite conditions appear. All of which makes it a relevant inquiry what difference the cases present as to the time spent in deliberation before, and the duration of the deliberations after, such an instruction was given.

In *Burton v. Neill,* 140 Iowa 141, at 142, the jury had been out about 5 hours when the additional instruction was given; in *Armstrong v. James,* 155 Iowa 562, some 15 hours; in *State v. Richardson,* 137 Iowa 591, at 594, 17 hours; in *German Sav. Bank v. Citizens' Nat. Bank,* 101 Iowa 530, at 547, 22 hours; in *Delmonico v. Smith,* 112 Iowa 659, more than 36 hours; in *Frandsen v. Chicago, R. I. & P. R. Co.,* 36 Iowa 372, at 378, 48 hours; and in *Clemens v. Chicago, R. I. & P. R. Co.,* 163 Iowa 499, at 506, where the giving of the instruction caused a reversal, some 50 hours.

In the instant case, the additional instruction was given after the jury had been kept together some 13 days, and had been deliberating upon its verdict some 48 hours. It stood 3 for acquittal and 9 for conviction when the additional instruction was given, and returned a verdict of guilty in something less than 4 hours thereafter. In the *Armstrong* case, supra, 4 hours or more was needed to reach verdict; in *Burton v. Neill,* 140 Iowa 141, at 142, the verdict was reached some 12 hours after the additional charge; in *Richardson's* case, supra, 14 hours elapsed; in the *Clemens* case,

supra, 20 hours. It seems to resolve into whether the relative time spent in deliberation may raise a presumption of prejudice against the instruction.

In the *Armstrong* case, while sustaining the instruction, we do so because of absence of other grounds for reversal. In *State v. See*, 177 Iowa 316, it does not appear how long the jury had disagreed, except that it was for "a considerable time;" and we sustain the instruction, though disapproving it, because "there is nothing appearing in this case to warrant a reversal because of the giving of this instruction." In *State v. Mulhollem*, 173 Iowa 242, 248, nothing is shown as to the duration of disagreement, except that the deliberations had lasted "several hours." The instruction, though disapproved, does not effectuate a reversal, because we find that the conditions give stronger warrant for approving the instruction than existed in the *Richardson* case, and we say:

"The evidence is so overwhelming and conclusive, as well as undisputed, that it is inconceivable that any candid juror could in good faith find any reasonable doubt of the guilt of the defendants. For that reason, if for no other, we think that the instruction could not have been prejudicial."

The dissent in Armstrong's case declares that the majority has marshaled all the extreme cases which "approached dangerously near the exclusive province of the jury," and that even those rest on the fact that, "under the peculiar circumstances of individual cases, no prejudice to the appealing party could be presumed."

The *Clemens* case emphasizes that the physical discomfort of long confinement, to men accustomed to outdoor living, creates a dangerous atmosphere in which to receive an instruction urging the yielding of the minority, and the desirability of verdicts; and that, where this is done, it "leads the mind to the more reasonable suspicion that they ceased further resistance, gave up their own convictions, and surrendered to the majority, than that they proceeded thereafter to the

laborious and uncertain task of convincing themselves that they were wrong;'' and that ''such instructions have been sustained largely upon the ground that, under the peculiar circumstances of each case, no prejudice could be presumed to have arisen to the complaining party,'' and the tendency of it is to be a ''tentative suggestion of longer confinement in the event they failed to agree.''

The only practical general rule that may be worked out from all this is that, where the disagreement is of more than ordinary and usual duration, and, after the giving of such an instruction as this, a verdict is reached in a time short in comparison with the duration of the disagreement, a presumption arises that the instruction was prejudicial; that, to use the words of the *Clemens* case, there should be a reversal where, in such circumstances, ''there is no competent evidence in the record to indicate that the jurors . . . were brought to a final agreement resulting in a verdict, other than through the coercive influence of this instruction, and the long hours of involuntary servitude to which they were subjected, with the tentative suggestion of longer confinement in the event they failed to agree.''

Testing the instruction in review by this standard, we find that, with the single exception of the *Clemens* case, the case at bar differs from the other cases in that its jury deliberated longer before the additional instruction was received, and reached verdict more quickly after the same was received; and it disagreed almost as long as in the *Clemens* case and reached agreement after instruction much more quickly than was done in the *Clemens* case. The jurors here had been kept together by the bailiff some 11 days before they entered upon their deliberations in the jury room; after some 48 hours of disagreement, three stood for acquittal when the instruction was given; it was late on Saturday night; and it got into the jury room that the trial judge had gone home and out of town for over Sunday, and that, while there was a judge

in town, he could only act to receive a verdict. It fairly had conveyed to it the idea that failure to agree meant confinement over Sunday, at least.

We think this raises a presumption of prejudice. Nothing appears, to overcome it. The suggestion by the State that the point is ruled by the *Mulhollen* case is unsound. In same, want of prejudice was found because the evidence of guilt was absolutely conclusive. This record presents a sharp conflict on every material element of guilt or innocence. We are constrained to hold that it was reversible error to give this instruction, under the conditions existing.

The rule above stated shows on its face how difficult it is to apply it with safety to the rights of the parties. That it is the one which our holdings compel, does not obviate its dangers. Therefore, though its wording is technically correct, and has often been approved, it will be better not to give it unless it be in an extreme case, and we suggest that, when given, it be done in language less likely to have a coercive effect upon the mind of the average juror.

**II.** There is testimony from which the jury could find that, in pursuance of a conspiracy to use his position as chief of police, as a means of obtaining money from persons who

2. CRIMINAL LAW: trial: misconduct of jury: reading newspapers in violation of order: innocence of bailiff.

were by him protected in violating the laws against selling liquor and prostitution, defendant had received money from a woman named Griffin. She testified as a witness that she had not violated these laws, and paid no money. After the jury began deliberating upon its verdict, somehow an issue of a reputable Sioux City newspaper got into the jury room, which had an article headed "Mrs. Griffin gets bond. Woman arrested for perjury in Peirce trial released." The article said that the woman had been arrested for perjury on information filed by the county attorney, been released on surety bond, and that the warrant for her arrest declared that she perjured herself while witness for this defendant. The jury was kept together at all times, and

one reason given for it was stated in a strong direction to read no accounts of or comments upon the trial.

2a. To complaint because some of the jury read this newspaper article, the State responds, first, that there is no evidence that the bailiff was guilty of misconduct in the matter. That is so. But if the reading is misconduct, it remains misconduct, no matter by what agency the newspaper reached the jury. *State v. Walton,* 92 Iowa 455, at 457-8.

2b. It is said there was nothing in the article to prejudice the jury in its deliberations, and that, there being no affirmative showing that the jurors were influenced by the reading, the discretion of the trial court precludes us from interfering with its action in refusing a new trial on this account. To require appellant to show affirmatively that the verdict was due in whole or in part to this reading would require him to contradict what inheres in the verdict, and would, therefore, demand of him evidence which he would not be permitted to use if he obtained it.

3. CRIMINAL LAW: trial: misconduct of jury: reading of newspapers: burden of proof as to prejudice.

2c. The major claim of the State is that we should be governed by the rule of appellate review, that trial errors and misconduct will not be deemed prejudicial where the testimony conclusively shows guilt; and it insists that this is the situation here, because the appellant has not raised the point that the evidence is insufficient to sustain the verdict. The same argument is used against other assignments. That defendant concedes there was sufficient evidence to sustain the verdict is no evidence that proof of guilt is conclusive, nor admission that a fair trial was had. It is a concession that, if the jury had not been improperly influenced, it was within its province to settle whether defendant was guilty or innocent; that fair weighing might have resulted either in the verdict reached or in one of not guilty; but that the scale was tampered with, and the weighing not fair.

4. CRIMINAL LAW: appeal: concession that guilt was jury question: effect.

2d. The State urges that the case differs from what it

would be if the article had contained accounts commenting on the case on trial in a manner adverse to defendant's interest; that the article contained no comment upon the trial; made no reference to the case, except as the arrest of this witness related to the trial; that it did not pretend to set out the testimony in connection with which it is claimed she committed perjury; and that the matter referred to by the article was a mere incident, separate and distinct from the trial of the case.

It has been held to vitiate the verdict, that the jurors read long newspaper accounts of the trial—*State v. Caine,* 134 Iowa 147, at 155; articles containing full reports of the evidence—*State v. Walton,* 92 Iowa, at 457-8; condensations of the evidence, including matters not in evidence—*State v. Caine,* supra; partisan comments to show that the evidence against defendant is strong—*Mattox v. United States,* 13 Sup. Ct. Rep. 50; *Cartwright v. State* (Miss.), 14 So. 526, at 527; and a full report of the arguments with condemnation of those for the defense—*State v. Walton,* 92 Iowa, at 457-8; attacks upon defendant—*Mattox v. United States,* 13 Sup. Ct. Rep. 50; *Cartwright v. State* (Miss.), 14 So. 526, at 527; *United States v. Ogden,* 105 Fed. 371; *Commonwealth v. Landis,* 12 Phila. 576; *Henry v. Sioux City & P. R. Co.,* 70 Iowa 233; *Wheeler v. Sterrett,* 94 Iowa 158; *Stone v. State,* 22 Tex. Ct. of Appeals 185; *Martin v. State* (Miss.), 56 Am. Rep. 812, 824; *Bessette v. State,* 101 Ind. 85, and *State v. Proctor,* 86 Iowa 698, at 701.

While defendant could complain if that had been done which these cases condemn, these cases do not speak in terms of exclusion, nor does what they disapprove exhaust what is objectionable. The test is whether fair trial was interfered with. There is no one rule of law that defines just what does or does not so interfere, and convictions have been annulled though newspapers read by jurors did not contain just what said cases found to be objectionable. Under our statutes:

"The reading of newspaper accounts of comments upon

the trial is thus prohibited by the letter and the spirit of the statute.'' *State v. Caine*, 134 Iowa 147, at 155; and see *Walker v. State*, 37 Tex. 366, at 389.

It is said in *People v. McCoy*, 71 Cal. 395:

''There is no doubt, however, that the reading of newspapers by jurors, while engaged in the trial of a cause, is inattention to duty which ought to be promptly corrected; and if the newspaper contains any matter in connection with the subject-matter of the trial which would be at all likely to influence jurors in the performance of duty, the act would constitute ground for a motion for a new trial.''

And see *Carter v. State*, 9 Lea (Tenn.) 440. . It is the same or worse than if the same comment had been orally injected into the body of the jury. *Cartwright v. State* (Miss.), 14 So., at 527; *United States v. Ogden*, 105 Fed. 371; *State v. Walton*, 92 Iowa, at 457-8. Something other than comment upon the case itself has set aside verdicts— for instance, references to another trial broad enough to cover the class of trials to which the case on review belongs (*Styles v. State* [Ga.], 59 S. E. 249); comment that other crimes were numerous and that the courts were failing to bring their perpetrators to justice (*State v. Walton*, 92 Iowa at 457-8); ridicule of a defense in another case which defendant is making in a case on trial (*State v. Robinson*, 20 W. Va. 713, at 762); a statement that accomplices have escaped (*Carter v. State*, 9 Lea [Tenn.] 440); abuse of those acting for defendant (*School Town v. Shaw*, 100 Ind. 268); accusing defendant of corrupt practices (*Henry v. Sioux City & P. R. Co.*, 70 Iowa 233).

The exact effect of the newspaper article as to witness Griffin was to tell the jury that defendant had put on a corrupt witness, and that the authorities were charging the witness with perjury—that she committed perjury to aid the defendant. In *Carter v. State*, 9 Lea 440, the newspaper stated merely that the trial had been long postponed or delayed because the father of defendant had failed to appear as a

witness against him. The refusal to grant a new trial was reversed, with the statement that:

"The comments were calculated to prejudice the defendant. And it is well settled, if facts are illegally before the jury, which may have prejudiced the prisoner, he is entitled to a new trial. The value of jury trial depends upon guarding jurors against any and every influence other than such as arises from evidence legitimately before them."

In *German-Am. Ins. Co. v. Harper* (Ark.), 67 S. W. 755; *Rudiger v. Chicago, St. P., M. & O. R. Co.* (Wis.), 77 N. W. 169, and *Welch v. Union Cent. Life Ins. Co.*, 117 Iowa 394, at 405-407, there was a reversal because the arguments of counsel abused witnesses. The abusive language was certainly not worse than saying they had perjured themselves. The article read by the jurors in this case was not merely a statement by counsel on one side that Griffin was perjured, but that of a paper, supposedly impartial, that the county attorney had so charged, by sworn information.

In *State v. Helm*, 92 Iowa 540, at 548; *Rudolph v. Landwerlen*, 92 Ind. 34, and *Whitsett v. Chicago, R. I. & P. R. Co.*, 67 Iowa 150, at 159, the matter condemned was a statement by counsel that witnesses for defendant had been corruptly influenced.

In *People v. Chin Non* (Cal.), 80 Pac. 681, a new trial was granted because of the reading by jurors in a criminal case of articles in newspapers insinuating merely that certain witnesses for the defense had committed perjury, stating that one of them had been arrested for perjury, and that a person interested in the defense had been excluded from the court room for signaling a witness.

*State v. Bruce*, 48 Iowa 530, at 536; *State v. Allen*, 89 Iowa 49, and *Commonwealth v. Fisher* (Penn.), 134 Am. St. Rep. 1027, 1056, are not controlling, because in them there is evidence that there was no prejudice.

We are unable to see that *State v. Jackson* (Mont.), 24 Pac. 213, has any bearing. And so of *People v. Leary* (Calif.),

39 Pac. 24. We find nothing in *Waterhouse v. Black,* 87 Iowa 317, cited by the State, which bears upon misconduct on part of anyone.

A new trial should have been awarded for the misconduct of the jury.

III.   Though the State suggests that the evidence is weak on whether the bailiff in charge told the jurors that the trial judge had gone to his home for over Sunday and that

5. CRIMINAL LAW:
trial: miscon-
duct of bailiff:
improper com-
munication with
jury.

a resident judge had no power except to receive a verdict, we find this established and undisputed. The communication violated the statute. Code Section 5387 provides that the bailiff shall not speak to or communicate with the jury, except to ask whether they have agreed on their verdict. *State v. Crafton,* 89 Iowa 109, holds that this provision is mandatory.

In *Cole v. Swan,* 4 G. Greene 32, at 33, it was shown that the bailiff "informed the jury that they would be kept by the court from Saturday evening until Monday morning without anything to eat, unless they would agree upon their verdict; and that, in consequence of this, one of the jury consented that a verdict might be returned."

We reverse because a new trial was not granted on account of this, and say:

"Any conversation by the officer ought to subject him to severe punishment by the court; and any verdict returned after such conversation, whether it had any influence or not in producing the verdict, ought to be set aside the moment the fact comes to the knowledge of the court. Although a juror might swear that in making up his verdict he was uninfluenced by the remarks made by the officer, yet he may be mistaken. It is the right of the party to have a verdict which is the result of an uninterrupted and unprejudiced deliberation."

Less than this set aside the verdict in *Farrer v. State,* 2 Ohio State 54, at 55. In *State v. La Grange,* 99 Iowa 10,

at 12, less is held to be misconduct of both jury and custodian, and to require reversal unless it is made to appear that no prejudice resulted. In *Miller v. Root,* 77 Iowa 545, at 549, it is said concerning a communication which is not stated, that nothing indicated that it was prejudicial. In *State v. Cowan,* 74 Iowa 53, at 56, the alleged statements were that the bailiff told one juror that the judge of the court said that, if the jury had once returned into court and been sent back to the jury room, "that it was a shame (or words to that effect) that one man should hang out against the eleven;" and further, that the bailiff had heard in the court room that they were going to bring in all the papers and the evidence to the jury room again; and that this induced the juror to agree, because he thought the judge ought to know better than he. That there was conflict on whether this occurred at all, alone suffices to account for our sustaining the trial court in denying a new trial. *State v. Beste,* 91 Iowa 565, at 568, 569, clearly does not rule here, and *State v. Crafton,* 89 Iowa 109, has no bearing on misconduct of bailiff. We hold that the motion for new trial should have been sustained for the misconduct of the bailiff.

IV.  The juror Swanson persisted in expressing grave doubt as to his ability to disregard what he had learned, and to give defendant a fair trial upon the evidence and the charge of the court. He persisted in this when pressed by the State with leading questions. It is far from clear whether he ever said unqualifiedly that he could give such trial. The overruling of challenge to him is not sustained by *State v. Fielding,* 135 Iowa 255, at 257; *Croft v. Chicago, R. I. & P. R. Co.,* 134 Iowa 411, at 416; or *State v. Hassan,* 149 Iowa 518, at 526. In them, the final word of the talesman was unqualified. Another juror in *Croft's* case had an opinion which was casual, superficial and qualified. In *State v. Smith,* 124 Iowa 334, at 335, the challenge was by the State, sustained, and that action affirmed. The overruling, here, goes to the very limit. If going fur-

6. JURY: qualification: bias.

ther shall be approved, it will amount to making a ruling upon a challenge conclusive on appeal. We will not reverse for this ruling, because it is open to question whether it be not sustained by *State v. Bone,* 114 Iowa 537, at 542, and *State v. Munchrath,* 78 Iowa 268, at 272.

V. It is urged that there was reversible misconduct of the court in its entire attitude during the trial; in remarks by it to the bailiff; in the manner of rulings; in remarks to witnesses and as to counsel.

The part of the complaint which deals with telling the bailiff concerning what to do with the jurors to keep them free from interference, and which it is claimed tended to

7. CRIMINAL LAW: trial: misconduct of court: directions to bailiff.

frighten them, seems to us to be hypercritical and strained. And so of threats to clear the room, which it is claimed were not justified by the conduct of those in the court room. At all events, neither, in reason, could prejudice defendant.

5a. The court, in admonishing the jury at the beginning of the trial, said:

"The rule in criminal cases is to prevent the jury from

8. CRIMINAL LAW: trial: misconduct of court: incorrect statement of law: harmless error.

separating after they were sworn to try the case. This rule is statutory."

As to this, it is now claimed: (1) that it is an incorrect statement, because jurors may be permitted to separate during the trial up to final submission, except where one of the parties objects; (2) that it was possibly calculated to unduly alarm the jury, especially when made in connection with the strict admonitions given the triers at the commencement of the trial. If what was said is not, in strictness, correct law, the error was harmless, and we cannot see what there was in it to alarm the jury.

5b. The remarks of the court while defendant's witness Miller was being cross-examined are hardly justifiable, but we do not think a reversal is required on their account.

5c. When the State excused the witness Wianand, its attorney remarked that the State had a right to put in its

case as it pleased. "We are not through with this witness.

**9. CRIMINAL LAW: trial: misconduct of judge: unwarranted reprimand of counsel.**

This is all we want with him now." The witness was not recalled when the State closed, and counsel for defendant professed to be surprised, and stated that the attorneys for the State had said they would recall the witness; whereupon counsel for the State said, "We didn't tell you any such thing." Counsel for the defense responded that the State had announced that they would want to recall the witness. Upon this, the court reproved counsel, saying the statement was improper, and that he asked counsel to refrain from making it; that the statement made by the State was that they would introduce their evidence in their own way; and that the court had told them they could do that. It is true it had not been said in so many words that the witness would be recalled, but more had been said than to claim the right to introduce evidence as the State pleased. It was also said that the State was through with the witness, and would not "want him now." The inference from this that the witness would be recalled was so very natural that counsel for the State should not have said, in effect, that the opposing one falsified in claiming that understanding. The reprimand given was unwarranted. If any was due, it should have been to counsel for the State. We do not think, however, this requires reversal.

5d. Officer Keane was a witness friendly to the State. On his direct examination, he was asked what was the fact as to his having seen De Roos at night and day frequently

**10. CRIMINAL LAW: trial: misconduct of court: unjust imputation on counsel.**

with Peirce in Peirce's private office. In objecting to this as leading and suggestive, counsel for the defense added that there ought to be some witnesses to whom an objection of that kind might be good, whereupon the court remarked:

"They would all be if Mr. Hatfield (one of the attorneys for defendant) had left them alone, and not got the statement."

Objection was made, and the court was asked to withdraw the remark. Whereupon it said that leading 'questions had been permitted because the witnesses seemed evasive, and that:

"The remarks of the court in reference to that, indicating that there had been any tampering with the witnesses, may be stricken from the record. The court did not intend to convey any such meaning."

We assume, therefore, and, for that matter, find the fact to be, that there was no foundation in the evidence for the quite suggestive intimation that Mr. Hatfield had so failed to leave the witnesses alone as that the court was required to permit their being led. Unjustified attacks by counsel upon parties have resulted in the annulment of verdicts. See cases cited in another division of this opinion. So have attacks upon those acting for a party (*School Town v. Shaw*, 100 Ind. 268), and attack of witnesses (*Rudiger v. Chicago, St. P., M. & O. R. Co.*, [Wis.], 77 N. W. 169; *German-Am. Ins. Co. v. Harper* [Ark.], 67 S. W. 755). We hold, in *Welch v. Ins. Co.*, 117 Iowa 394, at 405 to 407, that running comments. calculated to cast odium upon a witness will warrant a reversal, even though constant objection be not made; and where they are sufficiently gross, it is not material that they are provoked by objecting counsel.

Imputations by counsel that witnesses had been unduly influenced, tampered with or suborned, have caused reversals, or, for some special reason, have been disapproved without reversal. *Whitsett v. Chicago, R. I. & P. R. Co.*, 67 Iowa 150, at 159; *Rudolph v. Landwerlen*, 92 Ind. 34; *Rudiger v. Chicago, St. P., M. & O. R. Co.* (Wis.)., 77 N. W. 169; *State v. Helm*, 92 Iowa, at 545. If this is true of remarks by counsel, how much more injurious must such be when made by the trial judge.

In *State v. Helm*, supra, we say, as to what counsel said as to those who had given testimony favorable to his adversary, that:

"Any unauthorized statement which would make them appear to the jury to be less credible than they were in fact, would have been prejudicial to him. That the words in question were calculated to cast odium upon the witnesses to which they referred and cause their testimony to have less weight with the jury than it would have had if the words had not been spoken, is, we think, evident."

Is it not as injurious to have the court say it of an attorney for one party?

*State v. Stowell*, 60 Iowa 535, at 538, applies in principle, though an unjustified support of, and not attack upon, a witness is involved. In it, we hold that it was for the trial court to say whether corroboration was required. But because, in doing so, it was remarked that, "because of the tender age of the prosecutrix, . . . she was incapable of designing or fabricating evidence," we said:

"The effect, we think, necessarily was prejudicial to the defendant. We are not prepared to admit that the court, under the guise of determining some questions which are legitimately before it, can make remarks in the presence and hearing of the jury which would constitute error if contained in an instruction, but because they are not, it must be held the defendant is not prejudiced."

In *Shakman v. Potter*, 98 Iowa 61, 65, 66, during a difficulty between counsel over whether the one for plaintiff had correctly read an answer in a deposition, the court remarked, in the presence of the jury:

"Upon listening to the reading of the deposition, I have no doubt but what Mr. Bloodgood, plaintiff's attorney, was present at the taking of the deposition, or that the answers had been written out by him, or plaintiff's attorney."

We say:

"Manifestly, such a remark was not only erroneous, but highly prejudicial, . . . and the remark made by the court could have no other effect than to demolish and destroy the whole of the witness's testimony. If such a statement had been

embodied in the written charge of the court, it would clearly be erroneous; and while it was not contained in the formal instructions, yet its effect, following so closely the reading of the deposition, was just as prejudicial to plaintiff's case as if it had been.''

*State v. Philpot,* 97 Iowa 365, cited by appellant, presents so extreme a prejudicial remark on part of the trial judge as that the decision cannot rule here, and we cannot see much bearing in the case of *In re Will of Knox,* 123 Iowa 24. But without these, we are satisfied that the remark concerning Hatfield was injurious to defendant's cause, and, as will appear elsewhere herein, the injury was neither cured nor waived.

VI. The claim that there was misconduct in remarks concerning the recall of witness Wianand has been disposed of in dealing with alleged misconduct of the court in dealing with the same matter.

6a. The remarks by counsel for the State, during the cross-examination of De Roos and of Comeau, should not have been made; but we do not think they constitute misconduct demanding reversal.

6b. Argument by counsel for the State, in effect, that we no longer carried weapons, and were prohibited from doing so, because of reliance on performance of duty by the 11. CRIMINAL LAW: police department; and assuming that the trial: misconduct of counsel: argument. jury desired a verdict which would make them feel they had properly acquitted themselves of their duty, and were entitled to the approval of their fellow citizens; that the case had excited an interest unprecedented in the history of Sioux City, and that, therefore, most careful consideration was due, so that a fair and just verdict might be rendered, does not, in our opinion, transcend the proper bounds of argument. See *State v. Shultz,* 177 Iowa 321, Div. III; *State v. Cameron,* 177 Iowa 379.

It was stated in argument that the jury knew from the testimony that many witnesses interrogated in the county at-

torney's office were not taken before the grand jury because

12. CRIMINAL LAW: trial: misconduct of counsel: argument.

the witness either would not or could not give testimony that would aid the prosecution. There is enough insinuation that testimony was suppressed or witnesses intimidated, without any evidence of it, as that it would have been better not to have made such a statement.

6c. This was said in argument for the State:

"Would you go out on the street and meet any human being and justify a verdict of acquittal in the face of the

13. CRIMINAL LAW: trial: misconduct of counsel: argument.

convincing testimony and circumstances that have been heaped on here in this case, with the withholding of the only testimony we know of that could corroborate him—George Ford, the saloon keeper?"

It is argued that the man Ford was the witness whom the State intended to call, and as to whom it had served notice of its intention to so use him; and yet, in the argument, the State attempts to make capital out of the fact that he was not called by the defense, and that it was an appeal to the jury, challenging them to justify a verdict of acquittal, and is an unjustifiable demand to vindicate themselves at the expense of the defendant. We incline to think that on neither argument was there such transcending of the proper bounds of argument as that we can interfere.

There is some claim that the attorney for the State misused the prestige of his position by assertion that the defendant was guilty, and there is some language in *State v. Proctor*, 86 Iowa, at 702, and in *State v. Robinson*, 170 Iowa 267, which gives color to the argument that to permit this was prejudicial error. We think, however, the real decision of the *Robinson* case is as limited in *State v. Shultz*, 177 Iowa 321, and that, thus limited, the argument complained of does not constitute reversible misconduct.

6d. This was said in the closing argument for the State:

"You yourselves know that in the past year there has

been more crime, more murders, more holdups, more robbery

**14. CRIMINAL LAW: trial: miscon-duct of coun-sel: argument.** perpetrated in this city than in any time in its history. You cannot take up a paper in the morning without seeing from one to five burglaries and holdups and murders and where they hang out. Where would you go merely to find them?"

And this:

"Why, a case was tried here a year ago, the one Mr. Henderson refers to, when he and his co-counsel partner sat behind a man charged with the corruption of the public ballot of this city, guilty of election frauds in the Fifth ward of our town, guilty, and there can be no question about it. The court room was packed to standing, everybody on earth was there, and everybody was tried except the man that was charged with the crime—everybody; tried the attorneys and a man by the name of Smith. You recall something about that; they tried the poor fellow for a week; they tried the newspapers and everything on earth except the man charged with the crime; and the result was that the jury was so befuddled and beclouded that the guilty criminal walked free from the courthouse. And you see that the jury, from the beginning argument of counsel in this case, to about two minutes before he finally closed it, a desperate effort on the part of both of these gentlemen to try everybody and anything except the issues in this case. Now, isn't that fair; isn't that absolutely true?"

There was no testimony to warrant either argument. It is highly inflammatory in a case wherein a chief of police was being prosecuted for alleged prostitution of the powers of his office—conspiring to shield vice instead of protecting the public from it. And see *State v. Walton*, 92 Iowa, at 457, 458.

It is elementary that, with or without reference to its being inflammatory, counsel should not supply evidence on material points by claim in argument. *Little Rock & Ft. S. R. Co. v. Cavenesse* (Ark.), 2 S. W. 505; *Rea v. Harrington*, 58 Vt. 181; *Brown v. Swineford*, 44 Wis. 282; *Bullard v.*

*Boston & M. R. Co.* (N. H.), 5 Atl. 838; *Laubach v. State,*
12 Tex. Ct. of Appeals 583; *Martin v. State* (Miss.), 56 Am.
Rep. 812, 817; *Hall v. Wolff,* 61 Iowa 559; *State v. Giudice,*
170 Iowa 731. And see, specially, *Tucker v. Henniker,* 41
N. H. 317, 325. *Dowdell v. Wilcox,* 64 Iowa 721, somewhat
limits these, under the peculiar facts of the case, but is really
disposed of on the theory that the wrong could have been
cured on objection, and none was made.

6e. This further argument was made:

"Can there be any question possible, gentlemen, of the
guilt of this man of every one of these charges—and how
many thousands more nobody knows."

This is objectionable for all the reasons given in the cases
already cited. It, too, is highly inflammatory, under the con-
ditions prevailing on the trial, and was, moreover, an attack
on the party referred to which should not be permitted,
whether the one assailed be witness or party. *School Town v.
Shaw,* 100 Ind. 268; *Whitsett v. Chicago, R. I. & P. R. Co.,*
67 Iowa 150, at 159; *Rudolph v. Landwerlen,* 92 Ind. 34;
*Rudiger v. Chicago, St. P., M. & O. R. Co.* (Wis.), 77 N. W.
169; *State v. Helm,* 92 Iowa, at 545; *German-Am. Ins. Co.
v. Harper* (Ark.), 67 S. W. 755; *Wheeler v. Sterrett,* 94 Iowa
158; *Stone v. State,* 22 Tex. Court of Appeals 185; *Bessette
.v. State,* 101 Ind. 85; *Martin v. State,* 63 Miss. 505; *State v.
Proctor,* 86 Iowa, at 701; *Henry v. Sioux City & P. R. Co.,*
70 Iowa 233.

6f. Referring to one of the witnesses for defendant, the
prosecutor said:

"Kokomo Jimmie! Kokomo got his name by reason of
the ridiculousness of the fellow; a fellow who
was going to carry out a plot and scheme like
that going to a poor miserable dope fiend
like Kokomo Jimmie and telling him all he knew about it."

1b. CRIMINAL LAW:
trial: miscon-
duct of coun-
sel: argument.

There was no direct testimony to justify this statement.
But the State presents that counsel could supply the basis
for the statement by inference from the appearance of the wit-

ness. This might be quite persuasive if we had any way of determining here what the appearance of the witness was. The rule under which we sustain the trial court because it had the benefit of seeing the witnesses may hardly be extended so that counsel may go outside of the record and sustain it by claiming in this court that the physical appearance of someone on the stand, as they observed it, justified what was said. The argument was improper under very many of the cases heretofore cited and commented upon.

6g. So of the following argument:

"Did you observe as this testimony ran on, and Wianand had recited the different raids that were made, Flanagan's place—Flanagan's place was raided? Do you know that Flanagan is in this jail and will be tried here for murder, gentlemen? That is just the resort, and the places of the murder and the burglar and the holdup man, and the thief and pickpocket that they hang out and come from; and they have been protected here up until the time that this county attorney searched back into these records and brought forth this guilty liar, seeking to prostitute the highest office, the most important office, in this city, and that of chief of police."

16. CRIMINAL LAW: trial: misconduct of counsel: argument.

Officer Becker had testified that, among the many raids made under Peirce's direction, was one on a place kept by Flanagan, and that, a successful raid. Witness Wianand did not mention the Flanagan place or a raid thereon. There is no evidence that Flanagan was in jail, or charged with or tried for murder.

6h. *Little Rock & Ft. S. R. Co. v. Cavenesse,* supra, holds that, as a general proposition, prejudicial statements which it does not set out can be cured by charge of the court. *Sullivan v. Chicago, R. I. & P. R. Co.,* 119 Iowa 464, while it has some bearing on misconduct of counsel generally, is rather remote to the present controversy. The great weight of authority, however, is that, where the argu-

17. CRIMINAL LAW: trial: misconduct of counsel: argument improper and naturally prejudicial: waiver: cure.

ment is clearly improper and naturally prejudicial, no failure to object nor act of the court can be held to effectuate either waiver or cure. The Supreme Court of Nebraska states it well in *Chicago, B. & Q. R. Co. v. Kellogg* (Neb.), 76 N. W. 462, at 464:

"We would not, however, be understood as holding that a rebuke from the court, or even a complete retraction by the offending counsel, is in all cases of this kind a sovereign remedy. If the transaction be flagrant—if the offensive remark has stricken deep, and is of such a character that neither rebuke nor retraction can entirely destroy its sinister influence—a new trial should be promptly awarded, regardless of the want of objection and exception."

This is amplified and fully sustained: *Conn v. State,* 11 Tex. Ct. of Appeals 390; *Jacques v. Bridgeport H. R. Co.,* 41 Conn. 61; *German-Am. Ins. Co. v. Harper* (Ark.), 67 S. W. 755; *Chicago, B. & Q. R. Co. v. Kellogg* (Neb.), 76 N. W. 462; *Martin v. State,* 63 Miss. 505; *State v. Fuller,* 142 Iowa 598; *School Town v. Shaw,* 100 Ind. 268; *Whitsett v. Chicago, R. I. & P. R. Co.,* 67 Iowa, at 159; *Rudiger v. Chicago, St. P., M. & O. R. Co.* (Wis.), 77 N. W. 169; *Rudolph v. Landwerlen,* 92 Ind. 34; *Hall v. Wolff,* 61 Iowa 559.

VII. We do not think the question to Talbot, "What did he say to you along the line if it had not been for him (Peirce), De Roos would have gotten you out of there long before?" is objectionable for leading.

**18. WITNESSES: examination: leading questions.**     7a. We do not agree that questions propounded to Luse on redirect "are clearly leading." The witness was attempting to evade direct answer.

7b. The nature of the answers given by the witness Ray Talbot on direct for the State clearly shows that leading questions did not lead this witness.

7c. Concede that a statement that a letter was stolen is not sufficient foundation for oral proof of its contents. But the witness Davis did not state the contents. She said no

more than that it was addressed to and signed O. K. by defendant. Defendant was not harmed by this evidence.

7d. As to complaint concerning a question propounded to the witness Davis, it does not appear that the question was answered.

7e. The witness Becker, on cross-examination, produced a memorandum book, from which he testified as to certain alleged occurrences between him and Peirce which he put into the book at the time they happened, and testified to one of January 20th. Then this occurred:

19. TRIAL: reception of evidence: objection neutralized by objection.

"Q. What item have you got in there after January 20th? (Objected to as not proper cross-examination. Sustained. Defendant excepts.)"

This is complained of, and also that Becker was permitted, over objection, to read from the book. The one objection neutralizes the other, and there is no error.

7f. The cross-examination of Captain George W. Overmire, which is complained of, seems to us to have been permissible cross-examination.

7g. We are of opinion that the examination of Barr exhibits neither improper rebuttal nor impeachment by the party calling the witness.

7h. It is complained that, though defendant was not interrogated with reference to alleged gambling in certain places, yet cross-examination was permitted as to his knowledge of conditions in those places. Defendant had, in effect, denied that there were any violations of law permitted by him. The State could properly show, on cross-examination, that gambling and other forms of vice were permitted to exist in the city, to his knowledge, without arrest resulting. At any rate, the answer was a denial that he had such knowledge. This disposes of the complaint concerning the cross-examination of defendant with reference to his relations with Sam Rosen and Riffle.

20. WITNESSES: cross-examination: truthfulness of witness.

7i. The witness Cook said on direct that she had been arrested several times before she paid any money to De Roos. She was then permitted to answer the question whether she had been arrested again until she quit paying protection money.

**21. WITNESSES:** examination: systematically leading witnesses: effect.

The witness Nies was asked on direct: "Q. You do know counsel said a minute ago $50 of that $140 was remitted at the time, and you didn't get any of it; that is true, isn't it?"

Over the objection that it was leading, he answered that he got no part of it, and didn't know what the records show.

An officer named Luse testified, on cross-examination, that De Roos was complaining and making trouble over a loan De Roos had made to the officer, a loan for which Peirce had furnished Luse the money to repay De Roos. On direct examination, Luse was interrogated as follows:

"You have reason to believe that Peirce was endeavoring to poison your mind against De Roos, didn't you, from the statement he made to you similar to what you have recited here on cross-examination?"

State's witness Lang testified, on cross-examination, that he told attorney Hatfield that, if witness should quit selling every time De Roos gave him warning, he would have to go out of business. On direct, he was permitted to say, over objection that it was incompetent in form, that Hatfield, an attorney for the defendant, had not tried to straighten him up as a grand jury witness, and had not told the witness so, but that he just came to ask a few questions; and then this occurred:

"Well, the facts are that from the time Peirce was elected chief, and you commenced paying protection money, did you continue there at the Grand Hotel and sell beer at 50 cents a bottle, as much as a case a day, and continue to do that up to February of this year, without molestation; is that right?"

Over objection that it was leading and called for a mere conclusion, the witness answered, "Yes, sir."

Over objection that it was incompetent in form, irrelevant, immaterial, not proper redirect, leading and suggestive, and calling for a conclusion, the witness Becker was permitted, on direct examination, to answer a question how it came that Peirce got so anxious, along about the 19th of January, to have a warrant issued for De Roos, when Becker told Peirce of the bribe money a month before, on December 20th. Over the objection that it was leading, he was permitted to answer questions such as this:

"Did the county attorney tell you he would issue warrants? The county attorney did suggest to you and Peirce that if a warrant was desired you could get it at the police station or the justice court? As a matter of fact, Peirce didn't ask you to get any warrant, did he?"

On redirect, the witness Wendhausen testified that he could not say that Peirce was in Ford's saloon frequently while the witness was tending bar. Over objection, he was allowed to answer questions like this:

"That is what you say before the grand jury; he was there frequently, when you were under oath, and testified there before Hatfield and talked to you about your testimony, and when you were before the grand jury you testified that Peirce was in Ford's saloon frequently, didn't you? The facts are that he would come in several times a day, wouldn't he? The facts are that Peirce and Ford would talk to you often and were friendly, isn't it, and that is what you testified before the grand jury, isn't it?"

A witness for the State, one Heesch, said, on redirect examination, that he was a witness before the grand jury, and was then permitted, over apt objections, to answer questions like this:

"And you didn't testify before the grand jury about Peirce telling De Roos to go away, did you; and isn't it a fact that Hatfield tried to get you to state you heard Peirce say to De Roos, in substance, 'I don't want you here any more,' and 'Go away?'"

After the witness Overmire had testified on cross-examination to an instance in which a ·charge was changed from illegal liquor selling to one for disturbing the peace, because two witnesses relied on were no good, he was permitted to answer this question:

"You didn't tell this to the county attorney when he was trying his level best to get you to tell the truth, did you?"

On redirect, to answer questions like this:

"And you remember that when you were before the grand jury that you did not say you had been notified of raids by Peirce, didn't you?"

We are constrained to hold that the various objections made, including that the questions were leading, improper in form, and were attempts to impeach witnesses called by the interrogator, are well taken.

. In *Henry v. Sioux City & P. R. Co.*, 66 Iowa 52, at 56, we reversed because a party on the stand was constantly led and instructed ·upon the vital points in the case by plainly improper questions, and we said that:

"When such a question is asked, an objection by opposing counsel, even if sustained by· the trial court, does not prevent the mischief. Whatever injury or prejudice there may be to the opposite party is accomplished by asking the question."

We might not interfere if some of these examinations stood alone. But on the whole, and considering the record as a whole, we incline to think there was an objectionable system, and that it should not be used on retrial.

7j. Cook testified, on direct examination, that, on her trial in police court, two porters, who had been at her house on the occasion for which she was being tried, testified that they were then drunk, didn't know what they 22. EVIDENCE: had done, and had got beer, but didn't know hearsay: general principle applied. where they got it: Patrolman Spencer was permitted to answer, concerning the same incident, such questions as this:

"You know that these two porters came in there and swore that they were drunk, don't you?"

We think this should have been excluded, on the objection that it was hearsay.

7k. During the cross-examination of defendant, counsel for the State said to him: "I don't want you to lie about it; what is the fact?" On counsel for defendant's remarking that he thought something had been said about not wanting the witness to lie, counsel repeated: "I did tell him that. We want the facts." The examination was objectionable in form, and should not have been permitted.

23. WITNESSES: examination: impropriety in form.

71. The witness Becker read out of a memorandum book, from which he attempted to fix certain transactions on part of the defendant. He said that from this book he fixed the date when he claims Peirce came to him, and they went to the county attorney's office; that he marked therein the date at the time; and that it was a book wherein he consecutively put down transactions in connection with his own duties as police officer, a practice which he continued until January, 1915. The State urges that the book was simply used as a memorandum, to refresh the memory of the witness; that the leaves dealing with the transactions involved in the inquiry were taken from the book, and put in evidence; that, so far as it appears, these pages here introduced were the only ones used by the witness in refreshing his recollection; that the defense may not complain because the entire book was not offered, nor permitted to be examined by the defense; and that no prejudice could result from refusing to permit the introduction of the book as a whole. This is not persuasive. The purpose of using the book at all was to fortify the witness by presenting to the jury that what he said was borne out by genuine entries, made truthfully, from time to time, as the events recorded occurred. The book as a

24. WITNESSES: examination: admission of memory-refreshing books.

whole might well have justified the jury in rejecting this claim, or, on the other hand, induced it to sustain same. We are of opinion that defendant was entitled to have the jury see this book in its entirety, and that it was no protection against this that the witness had other and private matters in the book, which had, in effect, been made a witness.

7m. During the direct examination of defendant he stated, without objection, that, since he had been chief, over 400 search warrants had been issued, and some 4,500 arrests made, and over $16,000 in fines collected. On motion of the State the court struck this testimony from the record.

During the direct examination of W. W. Wianand, clerk of the police court, he was asked:

"Q. About what was the total of the fines collected by Mr. Peirce during the time he was chief of police? Q. And how did the amount of fees which were collected by Mr. Peirce during the 11 months that he was chief of police compare with the fees that were collected by the court the year preceding—the whole year preceding? (State objects as incompetent, irrelevant and immaterial. Sustained, and defendant excepts.)"

It was one theory of the defense that charges of "disturbing the peace" were made when the liquor laws were violated, because, so, the revenue of the city would be enlarged; and that this tended to show that defendant was devoting himself to the profit of the city, rather than to enriching himself by failing in duty to prosecute. It is the opinion of the writer that the testimony excluded was admissible in support of this trial theory, and that the collections in fines were larger than those brought in by his predecessors bore on the claim that defendant was not derelict in the work of his office. In this, no member of the court has concurred, which affirms this ruling.

7n. De Roos testified, on cross-examination, that his wife was employed by him in a snake show; that, while away from Sioux City, he went "broke;" that she sent him some money,

and he reached Sioux City in January, 1912. The defense

25. WITNESSES: impeachment: character impeachment: source of livelihood.

attempted to proceed further with this cross-examination, substantially on the line that De Roos had become able to engage in large financial transactions, after being penniless, because he co-operated with his wife in her earning money through prostitution, and maintaining a house of prostitution. To this an objection was sustained that it was an attempt to blacken the woman's character uselessly, unjustly and unnecessarily. Upon inquiry by counsel whether he might not inquire along these lines even though it happened to touch the wife of De Roos, the court said: "I don't think that is the purpose of the examination at this time;" and exception was duly taken.

The State contends that the proposed examination was entirely immaterial and irrelevant, and that, as indicated by the remark of the court, it was being indulged in, not for the purpose it was pretended to serve, but merely to blacken the reputation of the woman, in order, if possible, to disparage the testimony of the State.

The cross-examination excluded did tend to show what the character of the witness was. The statement by the trial judge that he did not think the examination was for the purpose of showing this, cannot change that, if received, the excluded testimony would have borne competently upon what character De Roos possessed, and was competent testimony upon a legitimate issue. Proper evidence may not be excluded merely because the court is of opinion that it is being adduced through improper motives.

For the errors pointed out in Divisions I, II, III, Paragraph 5d of Division V, Paragraphs 6d, 6e, 6f and 6g of Division VI, and Paragraphs 7i, 7j, 7k, 7l, 7m and 7n of Division VII, the judgment below must be reversed.—*Reversed* and *Remanded.*

EVANS, C. J., LADD and GAYNOR, JJ., concur.