OLOF NELSON, Appellee, v. C. F. ADAMS COMPANY, Appellant.

EVIDENCE: Best and Secondary—Non-original Entry Books—Re-
1  freshing Memory.   A non-original entry book, the accuracy of
   which is verified, may be used by a witness to refresh his

memory, and is admissible in connection with the testimony of the witness.

**EVIDENCE: Opinion Evidence—Custom and Usage.** Evidence reviewed, and held wholly insufficient to establish a custom or general usage among dealers in goods sold on the installment plan, to empower their superintendents to employ livery service at the expense of such dealers.

*Appeal from Polk District Court.*—LAWRENCE DEGRAFF, Judge.

MONDAY, MARCH 12, 1917.

ACTION on account for livery service resulted in judgment against defendant, from which it appeals.—*Reversed.*

*C. H. Miller,* for appellant.

*Miller & Wallingford,* for appellee.

LADD, J.—I. The defendant is a corporation engaged in selling household goods, such as rugs, curtains and the like, on the installment plan. Its principal place of business is in Erie, Pennsylvania, with about 30 branches located in as many states. One of these was located at Omaha, Nebraska, under which an office or store was established at Des Moines with a superintendent in charge. At the time in question, W. V. Amsbaugh was such superintendent, and, about the last week in January, 1914, represented himself to plaintiff as manager or sales agent of defendant, and according to the letter, said he wanted to get some horses for C. F. Adams Company and—

"wanted to find out my prices—what I was going to charge him. I told him I gave different prices according to the horse. Well, he picked out a horse. Says I, 'All right, you can have that horse.' Well, he said now he was going to put a wagon on later, but 'I am only going to use just one horse to start with, but suppose I can have more horses when I want them.' I said, 'Yes, I guess I can fix you out all right.' I told him I would furnish him

horses for $1 a day for agents. I didn't furnish more than one horse in January and February. The first of March he brought over two young fellows. He wanted me to rig them up with an outfit, and they worked part of March and up to the latter part of April; then they quit. I furnished horses up to the last part of November, 1914."

1. EVIDENCE : best and secondary: non-original entry books: refreshing memory.

After crediting all payments, there remained unpaid $168, and, as Amsbaugh was gone, recovery is sought from the defendant. Only two errors are assigned: (1) That Amsbaugh was not authorized·by defendant to hire horses; and (2) that the evidence was not such as warrants the receipt of plaintiff's book of account in evidence. These may be disposed of in inverse order. The plaintiff testified :

"I furnished horses from the first of January up to the last part of November, 1914. I put down every day in a little daybook that I had in my pocket, and every month I made up a statement and then put it on the bigger book. That little daybook is destroyed. I guess, after I put it in the big book, I didn't pay much attention to the little book; from day to day, every day I put it down who used the horse and what for; then I put it in the bigger book, or had somebody put it in, because I am a poor writer. So I took it out of the little book and put it in the larger book. It was not itemized in the big book—just put in monthly, by the month, so much a month, totaled up and the total of the month put in. I think the little book is destroyed. I guess I have the big book. This big book, Exhibit A, is a book that I transferred my business to from the little book. The first transfer of dealings with Adams Company is for January and February, and appears at page 27. The charge is not in my handwriting, but it was written down in my presence and at my dictation; the credit shown is in my handwriting. The·credits and debits on that page are correct, to my personal knowledge."

Each page of the account was verified in the same fashion. The account includes charges for horses furnished salesmen named Morris and Cook, which, as the witness swore, was at Amsbaugh's instance. Of course, this book was not admissible as a book of account under Section 4623, Code, 1897. The original entries were made by the witness, as were the monthly computations, and, as the entries in the ledger were the results of such computations and made at the instance and in the presence of the witness, these were the same as though also made by him. The original items, as well as ledger entries, were verified by him. He might have refreshed his memory from these, and, under recent decisions, their admission in evidence, to be considered only in connection with the testimony of the witness, was not error. *Graham v. Dillon,* 144 Iowa 82, and cases cited therein; *Porter v. Madrid State Bank,* 155 Iowa 617; *Worez v. Des Moines City R. Co.,* 175 Iowa 1; *State v. Peirce,* 178 Iowa 417. See *Cummings v. Pennsylvania Fire Ins. Co.,* 153 Iowa 579.

2. EVIDENCE: opinion evidence: custom and usage.

II. The record contains no direct evidence that Amsbaugh was authorized by the defendant to hire horses for it, to be used in the prosecution of its business. Payments on the account were made by Amsbaugh, but always in money or with checks of others endorsed by him—never by check of defendant or check payable to it endorsed over. His position was "superintendent of wagons," and he was in charge of an office bearing defendant's name in Des Moines, from which the goods were checked out to salesmen by him, and when returned, credited. He made use of a horse in selling goods from house to house, his wife being at the office during his absence, and his compensation was 5 per cent of all the goods sold and remitted for, whether by himself or others. Two men, Morris and Cook, with whom Cox often rode, were under him, and each received as compensation 5 per

cent of the goods he sold, and paid to Amsbaugh one half of the expense of horse hire, and not any when two rode in the wagon. Amsbaugh was allowed by the defendant $20 per month for office rent, regardless of cost, and kept no books for defendant. The only proof, aside from this, tending to show authority to Amsbaugh to act for defendant, is the course of dealing and custom. The evidence failed to establish a general custom, and was insufficient to show that there was a particular custom, in the business of selling goods from house to house on the installment plan, of furnishing salesmen with horse and vehicle, or for their managers so to do. The evidence went no further than that such was the practice of certain houses with which the witnesses had been connected or knew of. Thus, Ridgley, having qualified, and having said he knew the custom of those he had worked for, was asked—

"to state whether or not there was a certain custom as to the authority of agents such as Amsbaugh in the case at bar in Des Moines. A. I know from our own experience and lots of others as I say that I had worked for at different times what their custom was. Court: Was it always the same? A. Yes, it was always the same. Q. I ask you to state whether or not there was a custom in the state of Iowa, Des Moines, among installment houses, as to the authority of their agents such as the agent Amsbaugh at Des Moines. (Objected to unless the question includes whether or not the witness knows the custom governing the C. F. Adams Company with the rest.) A. I don't know what the custom was with the Adams Company. Q. That was not the question. A. It was the custom always with our house. Court: Just 'Yes' or 'No.' A. I can only speak from our own experience. Court: Every witness has to do that. A. That covers the point I can speak from our own experience. It was the custom of all the houses to— Court: 'Yes' or 'No.' A. I believe I can answer that question 'Yes.' Q.

I ask you what the custom was?  A.  The custom was—I
heard it spoke and hashed over in the store hundreds of
times—the agents of the L. C. Price Mercantile Company,
our company and the Western Company here, they all fur-
nished wagons and horses, the use of that for their agent to
work with, if that is what you want to know.  Of course
I don't know the inside workings of the Adams business
or anything of that kind, but I know these people always
furnished wagons for agents.  Price had two or three here,
and the Western people had two or three here.  Q.  Do you
know whether these agents had authority to hire wagons
and horses?  A.  The company always furnished them
that.  I know how companies operated for work I did.
Price brought his horses over there and the manager al-
ways paid the contract."

Coyne had been manager of an installment house, and
testified as to its custom in furnishing horses to salesmen
and others so far as he knew, but had no knowledge of the
authority of managers other than of the company by which
he had been employed. The evidence fell far short of war-
ranting the inference that a custom such as claimed pre-
vailed in the business of selling goods on payments in in-
stallments, and therefore did not justify any inference as
to how defendant was conducting its business.

Other evidence disclosed that, shortly after Amsbaugh
left, a man claiming to represent defendant called on plain-
tiff for wringers, and, upon request for payment of the ac-
count, told plaintiff that Amsbaugh ought to pay his own
debts.

One West, manager of the Omaha branch, was in the
city at about this time, and met plaintiff. After Amsbaugh
left, West arranged with Ellison, the collector, to take
charge of the office, and authorized him to hire a horse for
Cook, and the latter was to have 3 per cent on sales if these
exceeded $100 per week. The plaintiff testified that, prior

to January 1, 1914, he had furnished defendant horses, and explained that:

"There was one fellow came from Omaha, manager, by the name of Williams—he brought a fellow named Runnels. They said they wanted to rent a horse for the C. F. Adams Company in Omaha,—they were going to leave Runnels to do the managing in Des Moines,—and Williams made an agreement with me how much I was going to charge for my horses. I made arrangements with them to furnish the livery, and I sent my bill in to Runnels every month and got my money. This was before this claim. Then they had a Jewish fellow,—I forgot his name; after Runnels left, they sent a Jew. He came and engaged a rig the same as Runnels; they used one or two or three horses a day. That Jew kept on using the rig and finally run up a bill on me, and when he left he owed me about fifty some dollars. A fellow came from Omaha and settled this bill; he claimed he represented the C. F. Adams Company. He paid me the bill. Of course, he did not exactly pay all of it. It was fifty some dollars, and he settled for $50."

The mere circumstance that Amsbaugh was in charge of the office, checked the goods out to salesmen, and credited any returned, did not justify plaintiff in relying on authority to hire horses for use of himself or salesmen under him, and his declaration that he was getting them for defendant was hearsay. Such payments as were made did not purport to come from defendant, and the only other evidence is that, in one instance, the manager paid a portion of a bill which a former superintendent had forgotten to pay before leaving. We are of opinion that this was not sufficient, especially in view of the compromise, in connection with the other evidence adduced, to warrant a finding of even ostensible authority in Amsbaugh to incur the indebtedness against defendant.

III. Appellant's brief is criticized. It is not as well

gotten up as it should have been; but, as the two rulings quite clearly appear, and the propositions relied on are well stated, we are not inclined to dismiss because of failure to strictly comply with the rules. Because of insufficiency of the evidence to warrant a finding of actual or ostensible authority on the part of Amsbaugh to act for defendant in incurring the indebtedness, the judgment is— *Reversed.*

GAYNOR, C. J., EVANS and SALINGER, JJ., concur.